# WHEELING.

## NEWBERGER v. WELLS AND LEONARD.

Submitted June 6, 1901.    Decided June 7, 1902.

1. STATUTE OF LIMITATIONS—*In Equity—At Law.*

   In matters of concurrent jurisdiction, equity, by analogy, applies to stale claims, the bar of the statute of limitations, and recognizes the same exceptions to its operations that are allowed in courts of law.    (p. 628).

2. LACHES—*Disclosures in Bill—Avoidable by Facts.*

   When a bill in equity discloses on its face *laches*, or the facts alleged show that the cause of action is within the statute of limitations, the bill is for that reason demurrable, unless sufficient facts are set forth in it to avoid *laches* or take the case out of the statute.    (p. 632).

Appeal from Circuit Court, Wood County.

Action by Samuel Newberger *et' als.* against Chas. E. Wells *et als.*    Decree for defendants and plaintiffs appeal.

*Affirmed.*

W. N. MILLER, for appellants.

D. H. LEONATD, for appellees.

POFFENBARGER, JUDGE:

In June, 1896, Samuel Newberger and Dora Newberger filed their bill in equity in the circuit court of Wood County against Charles E. Wells and D. H. Leonard, trustee.    They allege that prior to June 1, 1876, Samuel Newberger was engaged in the mercantile business at Parkersburg and was the owner of a large stock of merchandise and a large and valuable tract of land, situated on Fishing Creek in Wetzel County, containing

between three thousand five hundred and four thousand acres, and being the residue of a tract of six thousand acres, out of which previous owners had conveyed certain portions; that on June 1, 1876, he made a general deed of assignment to D. H. Leonard, trustee, for the benefit of his creditors; that in the administration of said trust, Leonard and Newberger settled, by compromise or otherwise, practically all of the debts out of the proceeds of the property and the collections of the accounts; that on the 6th day of July, 1887, they negotiated a conditional sale of said tract of land to the defendant, Charles E. Wells, and put the contract in writing; that they agreed to sell said land to Wells, describing it in the contract as containing three thousand acres more or less, at two dollars and fifty cents per acre, "The quantity to be ascertained by a survey to be made at the expense of the party of the second part;" that the contract was an option to purchase the land for a period of sixty days from its date, and if Wells should decide to close the option by purchasing the land, he should deposit with Leonard, the sum of five hundred dollars on the purchase-money, and then the Newbergers agreed to join Leonard, the trustee, in a deed conveying the land to Wells; that Wells did not make the deposit within the sixty days, but at his instance and request, the option was extended for another period upon the same terms: that it was understood and agreed at the time that the difference between the amount for which the property might sell at public sale and the contract price of two dollars and fifty cents per acre should be paid to Dora Newberger in consideration of her joining in the deed and the relinquishment of her dower in the land; that, after accepting the contract and depositing the five hundred dollars, Wells caused a survey of the land to be made, but before it was completed, complainants procured Leonard to take the necessary proceedings to sell the land, and at the February term of the circuit court of Wetzel County, in some suit there pending, of the nature of which complainants say they are not advised, Leonard, trustee, was directed to sell the land as special commissioner, and did so, and the same was purchased by Wells for the sum of four thousand and fifty dollars, he paying part of the money in cash and executing his notes for the residue, and the court having confirmed this sale in June, 1888, Leonard, on the 16th day of July, 1888, executed a deed as special commissioner, conveying the land to Wells; that, about the 8th day

of May, 1888, Wells and one H. L. Wilcox, who had surveyed
the land for Wells, pretended and represented to complainants,
"Either through fraud, mistake or ignorance, or both, that there
were included within the boundary, excluding the exceptions
mentioned in the title papers, only two thousand and twenty
acres;" that complainants, still relying on the representations
aforesaid as to acreage, on the 10th day of July, 1888, executed a
deed whereby, in consideration of the sum of one thousand
eight hundred dollars, they conveyed the land to Wells with
covenants of general warranty, thereby confirming the sale made
by Leonard, trustee, as special commissioner, and, by mistake,
occasioned by the representations aforesaid, describing the
quantity to be two thousand acres more or less; that they are in-
formed and believe that Wells has fully paid to Leonard the
residue of the purchase money and they represent and charge
that all of Newberger's debts, for which the property could be
bound, have been compromised and paid or should have been
paid out of the money in the hands of Leonard as trustee to be
paid to Samuel Newberger; that they believed that, at the time
of said sale, said land was valuable for oil, and it has become
valuable oil territory, having many wells thereon producing
many thousands of barrels of oil annually; that they "recently
discovered that, as a matter of fact, there was a mistake in the
survey as aforesaid made by the said Wilcox and in his calcula-
tions of the acreage of said land; that they are informed and
believe that some time ago the said Wells had the said land re-
surveyed and ascertained the quantity to be three thousand
eight hundred (3,800) acres and not two thousand and twenty,
(2,020) as he and his former surveyor, Wilcox, represented when
complainants conveyed said land to him, and not two thousand
as recited in complainants deed to him; that they have just
recently discovered that in February, 1892, the said Wells and
others to whom he had conveyed interests in said land, made
leases thereof to the South Penn Oil Company in which they
described the quantity of land in said tract to be three thousand
eight hundred acres;" that they had no knowledge of said lease
nor of the quantity of land described therein until just before
the institution of this suit; that Wells had recently stated to the
complainant, Samuel Newberger, and to others that there is not
less than three thousand eight hundred acres of the land; that
since he purchased said land, Wells has recovered in the circuit

court of Wetzel County a judgment wherein the boundary recovered is recited to contain three thousand eight hundred acres, the exclusion from which of the excepted boundaries described in the judgment would leave about two thousand nine hundred acres or nine hundred acres more than Wells settled and paid for in his contract; that as soon as they discovered the mistake and error, complainants called the attention of Wells to the same and asked him to correct the mistake and settle with them for the land according to the actual acreage and Wells, at first, seemed disposed to settle the matter with them; but they were never able to get him to do so and he continues to neglect to correct the error and pay complainants what they are justly entitled to receive from him; and they believe and charge that he should be required to account to them for the difference, namely, one thousand six hundred and eighty acres at the rate of two dollars and fifty cents per acre which amounts to the sum of four thousand two hundred dollars, with interest thereon from July 10, 1888, until paid.

As exhibits, there were filed with the bill a deed from Edward Braiden and wife to Samuel Newberger, a deed from P. L. Gambrill and wife to Edward Braiden, a deed from Isaac Hoge and others to Gambrill, a deed of trust from Samuel Newberger to D. H. Leonard, trustee, the agreement between Newberger and wife and Charles E. Wells, the deed from Leonard, special commissioner, to Wells, the deed from Newberger and wife to Wells, the agreement between Wells and others and the South Penn Oil Company, and a copy of the order in the ejectment suit, in which judgment is confessed by Smith and others in favor of Wells and others.

Wells filed his separate demurrer to the bill, and the complainants so amended their bill, with leave of the court, as to show that the contract was made in the city of Parkersburg and that the plaintiffs and the defendant, Leonard, resided there. The defendants then demurred to the amended bill and the plaintiffs joined in the demurrer, and on December 1, 1900, the court sustained the demurrer, and the plaintiffs not desiring to amend their bill, it was dismissed and the cause is now in this Court on appeal.

The prayer of the bill is: "That the defendants, named as such in the caption of this bill, may be made defendants hereto and required to answer the same and each and every allegation there-

of, on their respective oaths, and, the premises being considered, that the said mistake in the execution of said contract of sale and the mistake of quantity named in their aforesaid deed to said Wells may be corrected; that said deed may be reformed and corrected in accordance with the facts now appearing; that the contract of complainants with the said Wells may be specifically executed in relation thereto, and that complainants may have a money decree against the said Wells for the said sum of four thousand two hundred dollars with interest thereon as aforesaid," and that complainants may have other, further and general relief.

The contract of July 6, 1887, giving Wells an option to purchase the lands in question, and which he afterwards accepted and acted upon, is perfectly clear in its terms and provisions, but the complainants found their bill upon the contention that Wells has not fully executed it upon his part and that his failure to execute it and the failure of complainants to require full payment of the purchase money, are due to the fraudulent conduct of Wells in representing to complainants that the quantity of land was only two thousand and twenty acres, when, in fact, it is three thousand eight hundred acres. Whether the contract required Wells to make the survey or not, the bill alleges that he did undertake and cause the survey to be made and made a false representation as to the result of that survey. If it was his duty, under the contract, to make the survey, his false representation, after making it and informing himself and agreeing in his contract to ascertain the true quantity, was fraudulent. If the contract did not require him to make the survey, and he did it voluntarily and misrepresented the quantity of land, such conduct was not only fraudulent, but embodied a higher degree of fraud. It was more active, officious and affirmative in its character than in the other case.

The difficulty in this case, on the question of demurrer, does not lie in the sufficiency of the allegation of fraud and mistake. The real trouble is encountered in determining whether the plaintiffs have resorted to the proper remedy and have brought their suit in time. The plaintiffs have made their deed, conveying the land to the defendant, and he has accepted it. The contract of July 6, 1887, has been fully executed, completed and performed, except that all the purchase money has not been paid, according to the theory of this bill. Under such

a contract the vendee has but two duties to perform.   One is to accept a proper deed; the other to pay the purchase money. Wells has performed the first, but has avoided and neglected, in part, the performance of the other.   The equitable doctrine is that the enforcement of terms must be mutual, and that where the vendee would have a right to the decree compelling the conveyance of the land to him, his vendor must likewise be permitted in equity to compel the acceptance of his deed and the payment of the consideration for it.   23 Am. & Eng. Ency. Law, 947.   The vendor may recover his purchase money in an action at law, but he cannot, in such action, compel the vendee to accept a deed.   In this bill the vendor seeks only to recover a part of the purchase money.   Another principle of law which must not be overlooked is that ordinarily a contract for the sale of land is completed by the execution and delivery of the deed by the vendor and its acceptance by the purchaser.   These acts annul the antecedent executory agreement and, upon it no action can be brought afterwards, even though the amount of land conveyed turns out to be less than was stated in the agreement. 28 Am. & Eng. Ency. Law, 132.   At page 140 of the same volume it is said:   "The conveyance is a consummation of the contract, with it all the rights of the vendor in the land cease, and by it there is vested in the purchaser the full legal and equitable titles of the property, subject only to the vendor's lien for purchase money."

This lien for purchase money would not exist in this State unless reserved in the deed.   Section 1 of chapter 75 of our Code provides that, "If any person convey any real estate and the purchase money or any part thereof, remain unpaid at the time of the conveyance, he shall not thereby have a lien for such unpaid purchase money, unless such lien is expressly reserved on the face of the conveyance."   If a lien did exist, that would give equitable jurisdiction to enforce, against the land, the payment of the purchase money remaining unpaid.   Such ground of equitable jurisdiction does not exist in this case.   No lien for the purchase money is reserved in the deed.   Then again we are confronted with the principles, announced by this Court in *Burbridge* v. *Sadler,* 46 W. Va. 39, that "A claim for compensation for deficiency in quantity of land conveyed by the deed, where the purchase money has been paid is a mere demand not cognizable only in equity but at law, and is subject to the statute

of limitations." It is said in the opinion in that case that a demand for compensation is barred by limitation; and, further, that "It was cause of action at once on the execution of the deed from Sadler to Melissa Burbridge. Five years would bar it. It is not like the case of a demand for compensation for excess in quantity where a lien for purchase money exists. There, I think, the lien extends to the amount due for surplus land; but, if there is no lien in the deed of conveyance, compensation for the surplus must be recovered in an action at law. So, where there is a deficiency. In either case like the sale of other property. In case of deficiency, compensation would be by action of trespass on the case, or, waiving the tort, in *assumpsit,* the liability being based on the theory of fraud and deceit in misrepresenting the quanty." However, in 2 Min. Inst. 699, it is said that "In cases of plain mistake or misapprehension, though not the effect of fraud or contrivance, equity will rescind the conveyance, if the error goes essentially to the substance of the contract; so that the purchaser does not get what he bargained for; or the vendee sells that which he did not design to sell; or if the circumstances do not demand a total rescission of the contract, the court will give relief by adjusting a compensation between the parties." At page 702 of the same volume it is said: "Wherever the real quantity turns out to be more or less than what was anticipated by the parties, whether the sale be by the acre or otherwise, equity entertains jurisdiction and gives relief on the ground of mistake." If this be true, such relief will be given upon the ground of fraud, where it produces the same result or upon the grounds of mistake and fraud combined.

This Court has announced the existence of an equitable jurisdiction very similar, if not like that claimed in the plaintiffs' bill, in many cases. In *Kelly* v. *Riley,* 22 W. Va. 247, it is held that, "A court of equity has jurisdiction to decree compensation for a deficiency in the quantity of land sold, although the land has been conveyed by a deed with general warranty, and the purchase money has all been paid;" and, further, that "Where by reason of the fraud of the vendor in misrepresenting the quantity of land sold, the vendee is entitled to compensation, or abatement from the purchase money, on account of deficiency in the quantity of land, courts of equity and courts of common law, have concurrent jurisdiction to grant relief." It was held in *Atkinson* v. *Beckett,* 34 W. Va. 584, that, in case of an ex-

change of lands in gross, if one party has been mislead and deceived by the other as to the quantity of land he was getting, and thus induced to enter into the exchange, equity will decree him compensation. In *Prichard* v. *Evans,* 31 W. Va. 137, it is held that "A court of equity has jurisdiction to abate from the purchase money due from vendee, for a deficiency in sale of land, by which the vendee was injured through the fraud of the vendor in misrepresenting the quantity of the land, on the face of his contract or deed, or orally." In *Nichols* v. *Cooper,* 2 W. Va. 347, this Court holds that "The principle upon which equity gives relief in cases of excess and deficiency in the estimated quantity upon the sale of lands is where there is a mistake; whether the mutual mistake of the parties, or the mistake of one of them occasioned by the fraud or culpable negligence of the other." In support of this, the Court in that case quoted and approved a part of the opinion in the case of *Blessing* v. *Beatty,* 1 Rob. 287. Somewhat similar to this, in respect to the ground of jurisdiction, are the following cases: *Anderson* v. *Snyder,* 21 W. Va. 632; *Crislip* v. *Cain,* 19 W. Va. 438; *Boggs* v. *Harper,* 45 W. Va. 554.

In those states, in which the implied lien for purchase money of land exists, this bill would no doubt be good as a bill for the specific execution of the contract of July 6, 1887, and that contract being under seal, the statute of limitations would not apply, because the bill was filed within ten years from the date of the contract. Nor would the court, in such state, dismiss the claim as stale on the ground of *laches.* While the purchaser has accepted the deed, that is a circumstance which only strengthens the case made by the plaintiffs' bill. If he had refused to accept the deed and to pay the purchase money, all a court of equity could do would be to compel him to pay the purchase money, and all the plaintiffs would be required to do, in order to obtain the aid of such court, would be to tender a sufficient deed, and the purpose of the proceeding, in such case, would be such as is sought in this bill, merely a recovery of money. But, as no such lien exists here, the bill is not sustainable on the theory of an implied lien for purchase money.

The following considerations conclusively show that this Court has been right in grounding equitable jurisdiction in cases of this kind upon mistake and fraud. Except for the mistake or the fraud of the defendant, these complainants, if their

bill shall be sustained by proof, would either have received, at the time of the execution and delivery of their deed, five thousand two hundred dollars for their land instead of one thousand dollars, or they would now hold that which is far better perhaps than a lien upon the land for four thousand two hundred dollars, namely, the land itself, or they would have accepted the one thousand dollars as part payment and reserved a lien in their deed for the remaining four thousand two hundred dollars of purchase money or would have had it secured in some other way. The mistake or fraud has, therefore, caused them to do that which materially affected their interest very much to their detriment. It has converted their property into a mere unsecured claim for money, and, if the defendant in this case were insolvent, the result would be irreparable loss and injury to them.

The grave question in this case is, whether this suit was brought in time. The demand of the plaintiffs is not purely an equitable one, nor is it purely legal in its nature. This sufficiently appears from what has already been shown. It is a matter of concurrent jurisdiction, and, therefore, the question of *laches,* raised on the demurrer, is exceedingly interesting and intricate, as well as difficult in its solution. In such case, ought the general principle of equity, that there can be no fixed and determined rule as to what will constitute *laches,* to be applied? Should cases of this kind be determined, as regards *laches,* by their own peculiar circumstances, in the sound discretion of the court, in each case, or should a court of equity, by analogy, apply the statute of limitations? Where the demand is purely equitable, courts of equity determine the question of *laches* upon rules and principles of their own, and may hold that the plaintiff is precluded by his *laches,* without regard to whether the period of delay is longer or shorter than that prescribed by the statute. Hogg's Eq. Pr. 415, and cases there cited. This Court decided in *Thompson* v. *Whittaker Iron Co.,* 41 W. Va. 574, that "Where a cause of action arises out of a fraud, the statute of limitations runs from its perpetration." Speaking of the demand in that case, which was held not to be of equitable cognizance, Judge Brannon said: "But if it could be regarded a trust, it is not cognizable only in equity, but is such a question as admits of legal remedy; and the statute of limitations applies to a trust, unless it be one only in equity

enforceable.    Counsel for appellant admits that the nature of
the demand is one of common law jurisdiction; that is, con-
current. That applies the statute by analogy.    The trusts not
within the statute are direct or express trusts cognizable only
in equity."    In support of this the following authorities are
cited:  Bart. Ch. Pr. 110; 1 Rob. Prac. (New) 458; 2 Wood.
Lim. Act s. 200; *Sheppards* v. *Turpin,* 3 Grat. 373; *Speidel* v.
*Henrici,* 120 U. S. 377; *Landis* v. *Saxton,* 16 S. W. 912.
Equity, however, in cases of legal demands, or matter of concur-
rent jurisdiction, recognizes as fully as courts of law, those ex-
ceptional cases, which by reason of fraudulent concealment of
the cause of action, or obstruction of the prosecution thereof, are
held not to be within the statute.    "It is well settled that a
subsisting, recognized, and acknowledged trust, as between the
trustee and *cestui que trust,* is not within the operation of the
statute of limitations.    But this rule must be understood as
applying only to those technical and continuing trusts which
are alone cognizable in a court of equity; and trusts which arise
from an implication of law, or constructive trusts, are not
within the rule, but are subject to the operation of the statute;
*unless there has been fraudulent concealment of the cause of
action,* and the statute is as complete a bar in equity as at law."
2 Wood Lim. Act, s. 200.    At another place in the same section
this author says:    "Therefore, it may be said that a trust, in
order to be exempted from the operation of the statute, must
be direct and express, and of a nature not cognizable at law but
solely in equity."    In *Speidel* v. *Henrici,* 120 U. S., at page
386, it is said by Mr. Justice Gray that "In the case of an im-
plied or constructive trust, unless there has been a fraudulent
concealment of the cause of action, lapse of time is as complete
a bar in equity as at law."    The statutory exception found in
section 18 of chapter 104, Code, provides that "Where any such
right as is mentioned in this chapter, shall accrue against a
person who had before resided in this State, if such person
shall, by departing without the same, or by absconding or con-
cealing himself, or by any other indirect ways or means, obstruct
the prosecution of such right,    * * *    the time that such
obstruction may have continued shall not be computed as any
part of the time within which the said right might or ought to
have been prosecuted."    A similar provision is found in the
statutes of limitations of most, if not all, the states, and cir-

cumstances bringing any case within the meaning of that exception may be replied to the plea of the statute therein made. From the authorities referred to it is clear that the bill cannot be sustained, unless the case falls within the statutory exception. It cannot be brought within that provision, unless upon some ground, forming an exception to the proposition laid down in *Thompson* v. *Whittaker Iron Co.,* holding that where a cause of action arises out of a fraud the statute runs from its perpetration. The doctrine there announced proceeds upon the theory that the act of the defendant, obstructing the prosecution of the action, must be subsequent to the act out of which the cause of action arose, and that the fraudulent act, which gave rise to the action, cannot be considered as performing the further function of obstructing the prosecution. That is generally true, but there seems to be an exception to it. In 19 Am. & Eng. Ency. Law, 2 Ed. 242, a distinction is made between that class of cases in which the basis of the action is the original fraud of the defendant and cases in which the cause of action arises from some other wrong. In the latter class of cases there must be some affirmative act or conduct by the defendant, separate and distinct from the original cause of action, to justify the postponing of the running of the statute. In the other class, the mere silence of the party is regarded as a continuation of the original fraud and as constituting a fraudulent concealment. As to that class of actions it is said "When the basis of the action or suit is some fraud committed by the defendant, and the plaintiff does not, and cannot by exercising due diligence, discover it immediately, the original fraud is regarded not only as causing the wrong complained of and for which the action or suit is brought, but as concealing the wrong, without any special proof as to the concealment beyond a showing by the plaintiff that, though exercising due diligence, he did not and could not become aware of the original wrong. In this way, causes of action arising out of fraud by the defendant rest upon the same footing, so far as the rule under consideration is concerned, as other causes of action not arising from fraud, but which have been concealed by fraud. In either case, the statute begins to run only from the time when the wrong of which the plaintiff complains was or ought to have been discovered by him."

In *Wear* v. *Skinner,* 46 Md. 257, under a statute somewhat different from ours, but no doubt intended for the same pur-

pose, the court held: "First, that it was not thereby meant that
in all cases a party must commit a fraud distinct from, and in-
dependent of the original fraud, for the purpose of keeping the
injured party in ignorance of his cause of action, nor that the
mere concealment of the fraud is insufficient. Second, that
where one practices fraud to the injury of another, the subse-
quent concealment of it from the injured party is in itself a
fraud, and if he is thereby kept in ignorance of his cause of
action, he is kept in ignorance by 'the fraud of the adverse
party.'" Robinson, J., delivering the opinion of the court, said:
"It is well settled by such courts (courts of equity), that where
a party has been injured by the fraud of another, and such fraud
is concealed, or is of such character as to conceal itself, whereby
the injured party remains in ignorance of it without any fault
or want of diligence on his part, the bar of the statute does not
begin to run, until the fraud is discovered, though there be no
special circumstances or efforts on the part of the party com-
mitting the fraud to conceal it from the knowledge of the other
party. And this is the rule too, when such courts are dealing
with legal demands, in regard to which, they obey strictly the
very terms of the statute of limitations." In support of this,
he cites a number of English cases, which seem to bear out what
he says, and also the case of *Bailey* v. *Glover,* 21 Wall. (U. S.)
346. He also reviews a number of English and American cases
in this connection and concludes that the position taken by him
in that case is not in conflict with the authorities.

In *Bailey* v. *Glover,* cited, Mr. Justice Miller, delivering the
opinion of the court, said: "We also think that in suits in
equity the decided weight of authority is in favor of the prop-
osition that where the party injured by the fraud remains in
ignorance of it without any fault or want of diligence or care
on his part the bar of the statute does not begin to run until the
fraud is discovered, though there be no special circumstances or
efforts on the part of the party committing the fraud to conceal
it from the knowledge of the other party." In *Quimby* v.
*Blackey,* 63 N. H. 77, an action of *assumpsit,* it was held that
the fraud by which a cause of action is concealed need not be
other than that which caused the original injury, in order to
prevent the operation of the statute of limitations. Smith,
Judge, said: "The defendant's neglect to give information to
the plaintiff in December, 1871, of the finding of his money and

to restore it to him, knowing it was the plaintiff's money, was fraud upon him. By their silence and inaction afterwards th original fraud was kept on foot. Their wilful silence was fraudulent concealment of the plaintiff's cause of action, con stituting a sufficient answer to the plea of the statute of limita tions." For this he cites *Way* v. *Cutting,* 20 N. H. 187; *Baile* v. *Glover,* 21 Wall. 342; *Bowman* v. *Sanbornm,* 18 N. H. 205 *Douglass* v. *Elkins,* 28 N. H. 26; *Coolidge* v. *Alcock,* 30 N. H 352, and a number of other cases. In *Haywood* v. *Narsh,* Yerg. (Tenn.) 69, it was held that "Where the fraud alleged was not discovered or known until within a few month's be fore the bill was filed, it prevents the statute of limitations from barring the claim in equity." There, as in the other cases re ferred to, the cause of action arose solely out of the fraud of the defendants. To the same effect is *Bank* v. *Harris,* 118 Mass. 147. The Court of Appeals of Virginia, in *Rice* v. *White,* 4 Leigh 474, intimated the same view, although the question was not sufficiently presented to enable the court to pass upon it definitely. The plaintiff did not plead his ignorance of the fraud and that the cause of action had been fraudulently con cealed, and, for that reason, the plea of the statute was held good against him. The second point of the syllabus reads as follows: "It seems, that if the fraud was not discovered till some time after it was practiced and within the time of limita tion, this would suffice to take the case out of the statute; but to enable the plaintiff to avail himself of such matter, he must plead it specially in his replication." Judge Carr said in that case, "I do not undertake to decide, how the question would have been, if to the plea of the statute, the plaintiff had replied that the defendant had fraudulently and deceitfully concealed from him the cheat he had practiced upon him; and that the suit was brought within five years after the discovery. In that case, there must have been either a demurrer, which would confess the fact, and put the case upon the law; or an issue, and then the fact would be directly in issue." He directed that the judg ment be reversed and the cause sent back for a new trial. Tucker, President, said, "But it is said he did not know it; that it does not appear that the fraud was discovered more than five years before the suit brought; and that, therefore, the bar of the statute does not apply. Had the plaintiff replied that matter, I should have been unwilling to disturb the verdict

the ground of the statute." He opposed a reversal because the failure of the plaintiff to plead his ignorance of the aud. The judgment was reversed. The same principle is cognized in *Vanbibber* v. *Beirne,* 6 W. Va. 168.

These cases seem to establish the principle laid down in 19 m. & Eng. Ency. Law, 2d Ed. 242, and this case undoubtedly lls within that principle. The cause of action set up in the laintiffs' bill is based mainly upon the alleged fraud of the efendant. That fraud, if any, was an affirmative, possitive t, apparently designed and intended, and certainly well cal-ulated, to prevent an investigation on the part of the plaintiffs to the quantity of land. It not only induced them to make he deed in consideration of less money than the defendants had greed to pay them, but it had the further effect of lulling them sleep, giving them an assurance that there was not over two housand and twenty acres of land and blinding them to their ctriment and injury. The misrepresentation just as clearly nd effectually obstructed the prosecution of the cause of action fter that cause of action had been created as it produced the ight of action itself. It was not only a misrepresentation as to he quantity of land but that representation purported to be the esult of a survey. The falsity of it could not be known to the laintiffs. Nothing short of another survey, at considerable ex-ense, would have revealed the fraud. The sale having been ompleted, the deed made, and Wells put into possession of the and, the plaintiffs had no right to go upon it and survey it vithout his permission. True it is, that out of mere suspicion, fear or curiosity, they might have questioned the truth of the statement and the *bona fides* of Wells' conduct, but that is all hey could have stood upon in bringing a suit against him be-fore they made the discovery. But it is useless to pursue spec-ulations as to what the plaintiffs might have done. It is enough that they had the right to rely upon the defendant's representa-tion until they discovered that it was false. He had thrown them off their guard in the most formal and effectual manner. "There is also a wide distinction between a case where the action is predicated upon the fraud of a party in the sale of property, or where he has fraudulently thrown a person off his guard, has prevented such an investigation as would have revealed the truth, and one which is predicated upon a breach of contract of warranty, however false the warranty may be. In the former

case the statute would not begin to run until the fraud was, or reasonably could have been discovered." 1 Wood Lim. Act, s. 155, p. 415.

But, to avoid the statute of limitations in such case as this, the bill must allege that the cause of action was fraudulently concealed, or that the prosecution of it, in the language of the statute, has been obstructed, specifying the means of obstruction, which, in this instance, could be nothing other than fraudulent concealment of its existence. Had the plaintiffs amended their bill in this respect, it might, under the principles adverted to, be good, but they failed to do so. *Laches* is apparent on the face of the bill and no sufficient excuse for the delay appears. It is clearly not enough that they failed to discover the mistake or fraud. They must allege that by some act or conduct of the defendant they were prevented from so doing, or the prosecution of their right was obstructed, and the want of such allegation is cause of demurrer. *Vanbibber* v. *Beirne,* 6 W. Va. 168; *Jackson's Adm'r* v. *Hull,* 21 W. Va. 610; *Paxton* v. *Paxton,* 38 W. Va. 616; *Whittaker* v. *Improvement Co.,* 34 W. Va. 217; *Van Winkle* v. *Blackford,* 33 W. Va. 584; 1 Bar. Chy. Pr. 84; Story's Eq. Pl., s. 484, and notes; 12 Ency. Pl. & Pr. 832. That the nature of the matter to be set up in the bill in avoidance of *laches* is such as is above indicated is shown by the book last above cited at pages 834, 835, 836 and 837. "Where ignorance of rights or wrongs is relied on to account for *laches,* this fact must be plainly alleged in the bill. The plaintiff must also allege why he was so long in ignorance and the means used to keep him so. * * * The foregoing rules are peculiarly applicable to cases where excuse for *laches* may be founded upon fraud, mistake, concealment, or misrepresentation, and in such case it is necessary to allege these facts in avoidance in the bill. The particular acts of fraud or concealment should be set forth by specific and distinct averments, and it will not be sufficient to allege their occurrence in a general or vague way." *Id.* 836-7. Where the statute is applied by anology, the excuse made in the bill must be of the same nature and be set up with the same particularity as in a replication to a plea of the statute of limitations.

Thus, treating the bill as one sufficiently charging fraud, it is insufficient for want of allegations excusing *laches* or taking the case out of the statute of limitations. But is fraud suf-

ficiently alleged? The bill says the execution of the deed in consideration of less money than the grantors were entitled to receive according to the terms of the contract was due to "either fraud, mistake, ignorance or both." When it appears on the face of the bill that sufficient time has elapsed to apply *laches* to the demand set up, and fraud and concealment are relied upon, must not the fraud be charged with certainty, and without equivocation? But this is not the only source of doubt as to sufficiency. The survey was made; not by Wells, but by Wilcox, his agent. If Wilcox, by mistake, or fraud, misrepresented the quantity to plaintiffs, without the knowledge of Wells, or to Wells, and he, relying upon the representation in good faith, innocently misrepresented the quantity to plaintiffs, the fraud on the part of Wells was constructive only, and did not prevent the running of the statute. It is not charged that Wells was aware of the fraud. Hence it cannot be said that he committed an act which worked a fraud upon plaintiffs, and at the same time, a concealment of it. Assuming that there was such constructive fraud and Wells afterwards discovered it, and then remained silent, the bill presents no charge of an affirmative act on the part of Wells working an obstruction to the prosecution of the cause of action. Something of an affirmative nature so operating is undoubtedly required as has been shown. But a careful reading of the statement of the substance of the bill, given above, carries conviction that the theory of the bill is mistake and not fraud. "Mistake" is used frequently; "fraud" but once, and then in the most uncertain manner. The demand is one of concurrent jurisdiction, and enough has been said to clearly show that, in the absence of some obstruction postponing the running of the statute, it begins to run as soon as such cause of action arises. When it arises from mistake only there is no obstruction, unless there is a subsequent act of obstruction. None is alleged here. Hence, the statute began to run at the date of the mistake.

For the foregoing reasons, the decree complained of must be affirmed.

*Affirmed.*