Carl M. DUTTINE, trustee of Diversified Mountaineer Corporation, Plaintiff,

v.

Nick SAVAS, Defendant.

Carl M. DUTTINE, trustee of Diversified Mountaineer Corporation, Plaintiff,

v.

Emanuel A. KOSTAS, Defendant.

Carl M. DUTTINE, trustee of Diversified Mountaineer Corporation, Plaintiff,

v.

Ruth Cox TURNER, Defendant.

Carl M. DUTTINE, trustee of Diversified Mountaineer Corporation, Plaintiff,

v.

Willard L. PHILLIPS, Defendant.

Carl M. DUTTINE, trustee of Diversified Mountaineer Corporation, Plaintiff,

v.

J. Rexford WHITE, Defendant.

Carl M. DUTTINE, trustee of Diversified Mountaineer Corporation, Plaintiff,

v.

Ernest JOHN, Defendant.

Civ. A. Nos. 75–0344 CH to 75–0349 CH.

United States District Court,
S. D. West Virginia,
Charleston Division.

June 15, 1978.

Charles M. Love, III, Bowles, McDavid, Graff & Love, Charleston, W.Va., for plaintiff.

William T. Lively, Jr., Lively, Light & Bias, Charleston, W.Va., for defendants.

COPENHAVER, District Judge.

In these consolidated civil matters, Carl M. Duttine, Trustee of Diversified Mountaineer Corporation under Chapter X of the Bankruptcy Act, seeks to recover upon various demand notes given by the defendants individually to Diversified Mountaineer Corporation (hereinafter DMC). Each note was given to DMC, the parent corporation, in exchange for shares of stock in nine of DMC's subsidiary industrial savings and loan corporations. The defendants served as members of the Board of Directors of one or more of the nine subsidiaries. The shares so received apparently were part of issues originally owned and paid for by DMC, save for a few instances in which an individual originally supplied the paid-in capital.

Seven of the subsidiaries were West Virginia corporations and two were Virginia corporations. All nine were wholly owned by DMC except for the shares held by the directors. The shares held by them constituted the minimum number of qualifying shares required by the statutes of each state. See W.Va.Code § 31–7–9a (1961), prescribing that each director of an industrial savings and loan company throughout his term "shall own and hold in his own name at least five hundred dollars par value in unpledged shares of the capital stock or voting stock of such company." See Va. Code § 6.1–235 (1966), requiring that each director of an industrial loan association "shall own in his own right and have in his personal possession or control shares of stock in the association of which he is a director aggregating at least one hundred dollars in par value, and which must be unpledged and unencumbered at the time of his becoming a director and during the whole of his term as such."

Each note was noninterest-bearing, save for a few instances in which the parties

inadvertently failed to specify the intended noninterest-bearing character of the note. Counter-balancing the noninterest feature of the notes, the directors holding the qualifying shares waived any dividends on their stock and waived their preemptive rights as shareholders to purchase stock out of any future issues offered by each subsidiary in which their stock was held. In addition, each of the defendants granted a 20-year option to DMC to purchase his or her shares in each of the subsidiaries at either the book value or the purchase price, whichever should be higher.

As each note was given, it was understood by the payor of the note and DMC's president, as well as at least some of the DMC directors, that the maker would not be required to pay it. This understanding, however, was never made the subject of action by the Board of Directors. The notes were retained by DMC as assets and the minority stock interests of the directors in the subsidiaries were retained on the company books. Nevertheless, neither the notes nor the minority stock interests were treated or reported as such on the consolidated financial statements and reports of DMC and its subsidiaries after 1967. In this connection, the accountants regarded the minority stock interests as being so small as to be immaterial for financial statement purposes.

As to the stock, each of the directors signed an annual sworn statement which was subsequently filed with the West Virginia Department of Banking for each of the West Virginia subsidiaries of which each was a director, reciting under oath that "he is a *bona fide* owner of at least Five Hundred Dollars par value of the capital stock of said company standing upon the books of said company." The evidence is silent as to whether statements were similarly filed with the Virginia authorities.

The following figures represent the aggregate face amount of the notes owing by each defendant. The figure in parentheses denotes the number of notes owing by each. This figure is also the number of subsidiaries of which each such defendant was a director.

| | | |
|---|---|---|
| Nick Savas | $ 9,936.57 | (9) |
| Emanuel A. Kostas | 14,851.54 | (9) |
| Ruth Cox Turner | 12,279.58 | (8) |
| J. Rexford White | 17,343.27 | (8) |
| Willard L. Phillips | 10,173.54 | (8) |
| Ernest John | 1,000.00 | (1) |

Except for four $1,000 notes included in the above amounts, all of the notes were executed within ten years before the filing by DMC of its Chapter X petition for reorganization under the Bankruptcy Act on February 8, 1974. The payor and date of each of the four $1,000 notes are as follows:

| | | |
|---|---|---|
| Nick Savas | 1/17/63 | $1,000 |
| Ruth Cox Turner | 1/10/63 | 1,000 . |
| Willard L. Phillips | 1/ 7/63 | 1,000 |
| Ernest John | 1/10/63 | 1,000 |

The directors of DMC included Savas, Turner and Phillips from 1960, Kostas from 1966, and White from at least 1971. All five were serving as a majority of the Board of Directors during the 1971–73 period when the four $1,000 notes were approaching and reaching their ten-year anniversary dates. Among the six defendants in this case, only Ernest John was not a director of DMC, he being a director until 1972 of the DMC subsidiary at Chester, West Virginia.

The six defendants engaged in a scheme among themselves and other officers and directors of DMC to circumvent the mandate and purpose of the West Virginia and Virginia statutes requiring each director of an industrial savings and loan corporation to own in his own name unpledged shares of stock therein as follows: In West Virginia, stock of at least $500 par value; in Virginia, stock of at least $100 par value. Although the directors nominally held stock in the minimum amounts required by the industrial savings and loan laws as qualifying shares in the subsidiaries, they entered into a nullifying side agreement with DMC, the parent corporation which owned all the remaining shares, being in excess of 99% of the outstanding subscribed stock. Pursuant

to this collateral agreement, the directors agreed in writing to forego dividends and preemption rights on the stock registered in their names in exchange for their giving a noninterest-bearing note on which it was secretly understood that payment would never be made. In keeping with both the written 20-year option to DMC and the advice of DMC President Price, it was further understood that the directors would be entitled to such appreciation in the book value of the stock, if any, as might be realized over and above the cost represented by their respective notes. Thus, the directors found themselves in the enviable position of holding qualifying shares from which they could profit but suffer no loss while all the time serving on the boards of the subsidiaries from which they received substantial directors' fees.

## I.

The defendants raise three defenses that have become the classic response in an action involving notes given under the circumstances outlined above in the findings of fact, namely, unenforceable illegal agreement, conditional delivery and want of consideration. In this instance, each of these defenses is *alter idem* of the other and will be treated jointly. The court finds that the defendants are estopped from raising any of these three defenses under applicable West Virginia and Virginia law.

■ Both the West Virginia and Virginia industrial savings and loan statutes specify that the directors of such a company, as a condition of office, must own the prescribed minimum of the company's shares of stock. W.Va.Code § 31-7-9a (1961); Va.Code § 6.1–235 (1966). The purpose of such a provision is, as aptly stated in *Tooker v. Inter-County Title Guaranty and Mortgage Co.*, 295 N.Y. 386, 68 N.E.2d 179 (1946), to protect the public, including depositors, by requiring every director of such an institution to share its business risk to the extent of undiluted ownership of the specified amount of its stock. By way of contrast, neither West Virginia nor Virginia has re-

quired under their general corporation laws that directors of a corporation be stockholders unless the articles of incorporation so stipulate. W.Va.Code § 31-1-16 (1961); Va.Code § 13.1–35 (1966). Recently, both states made comprehensive revisions of their general corporate statutes without changing the corporate requirements in this respect. On the other hand, following the DMC debacle, both states revised their banking laws with respect to industrial savings and loan corporations and, in doing so, retained the qualifying shares requirement for directors of such institutions. *See* W.Va.Code § 31–7–17 (1975); Va.Code § 6.1–235 (1973 and Supp.1977).

■ The scheme in which these defendants participated would, if sustained, nullify the very purpose of the qualifying shares statute. Moreover, the method employed here would effectively preclude the detection of the scheme by the examining authorities. In West Virginia, the Commissioner of Banking is charged by statute with the supervision and control of industrial savings and loan companies in the manner prescribed for banking institutions, including periodic examinations. W.Va.Code § 31-7-13 (1961). In Virginia, this same duty is imposed on the State Corporation Commission. Va.Code § 6.1–237 (1966). Nevertheless, inspection of the books and records of the savings and loan subsidiaries would simply have disclosed the apparent existence of the minority stock interests. On the other hand, the notes were in the hands of the parent under a secret verbal agreement that they would not be enforced, safely shielded from the scrutinizing eye of the examiner.

In light of the facts herein, the court finds the defendants estopped to argue the unenforceability of these notes. Although authority directly in point on the application of estoppel under the circumstances of this case is lacking in West Virginia and Virginia, both states have long observed the common law principle of equitable estoppel.[1] "The doctrine of equitable estoppel is

1. The court finds it unnecessary to determine whether West Virginia or Virginia law is appli-

cable on the issue of estoppel. Estoppel is a common law doctrine applied according to uni-

universally recognized by the courts." *United States ex rel. Noland v. Wood,* 99 F.2d 80, 82 (4th Cir. 1938). *See Calfee v. Burgess,* 3 W.Va. 274 (1869); *Bower v. McCormick,* 64 Va. (23 Gratt.) 310 (1873).

Customarily, the doctrine of equitable estoppel requires a showing of reliance and injury as a result of fraud or misrepresentation. The defendants insist that equitable estoppel is inappropriate in this instance because no creditor is shown to have been misled or relied upon the existence of the notes. Under the federal rule and the prevailing authority in the states, however, it is enough that the defendants' scheme contravened the applicable statutes, W.Va. Code § 31-7-9a (1961) and Va.Code § 6.1-235 (1966). *See D'Oench, Duhme & Co. v. F. D. I. C.,* 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942); *Deitrick v. Greaney,* 309 U.S. 190, 60 S.Ct. 480, 84 L.Ed. 694 (1940); *Bryan v. Bartlett,* 435 F.2d 28 (8th Cir. 1970), *cert. denied,* 402 U.S. 915, 91 S.Ct. 1373, 28 L.Ed.2d 658 (1971); *Tooker v. Inter-County Title Guaranty and Mortgage Co.,* 295 N.Y. 386, 68 N.E.2d 179 (1946); *Mount Vernon Trust Co. v. Bergoff,* 272 N.Y. 192, 5 N.E.2d 196 (1936); 14 *Williston on Contracts* (3rd ed. 1972) § 1631A and numerous cases there cited; *Restatement of Contracts* § 601, esp. illus. 6. *See also Little Switzerland Brewing Company v. Oxley,* 156 W.Va. 800, 197 S.E.2d 301 (1973).

The *Tooker* case involves a similar factual situation. There the bank sold ten shares to Tooker in order that he would qualify as a director under a New York law [2] which is similar to W.Va.Code § 31-7-9a (1961) and Va.Code § 6.1-235 (1966). Instead of tendering a noninterest-bearing nonobligatory note, Tooker entered into an agreement which gave him the option to compel the bank to repurchase his shares. After

the bank went into liquidation, Tooker brought suit to enforce the repurchase agreement. The court held Tooker could not recover, stating that enforcement of the repurchase agreement would be contrary to the very purpose of the New York law which, as already observed, is the protection of the public by insuring that every director has a financial stake in his bank:

> The contract in suit inevitably supplied to the plaintiff a means whereby at any time during his directorship he was equipped to free himself in a substantial degree from the chance of financial loss incident to record ownership of his qualifying shares, with the result that the character of his duty as a director may well have been reduced in like measure. Such an arrangement inherently tended to thwart the public purpose declared by § 116 and, therefore, no cause of action can be founded thereon. 68 N.E.2d at 181.

As applied to this case, the principles set forth in *Tooker* operate to bar the enforcement of the collateral agreement which would otherwise render the notes nonobligatory. It is the collateral agreement, not the notes, which thwarts the public purpose of W.Va.Code § 31-7-9a (1961) and Va.Code § 6.1-235 (1966).

In *Deitrick v. Greaney,* 309 U.S. 190, 60 S.Ct. 480, 84 L.Ed. 694 (1940), the receiver of a national bank brought suit to compel the payment of a promissory note given to the bank by one of its directors in return for shares of the bank's stock illegally purchased and retained by the bank. The transfer was made pursuant to the understanding that the note would not be paid and that the bank would continue to retain ownership in the stock in violation of a provision of the National Bank Act de-

---

versal equitable principles. Furthermore, as is evident from the discussion, *supra,* the statutory provisions of West Virginia and Virginia are identical for all relevant purposes. Where, as here, there is no conflict between the laws of the states, the court declines to choose between them.

**2.** This law provides in relevant part "Every director of a bank or trust company shall be a stockholder of the bank or trust company owning in his own right free from pledge, lien or charge shares of its capital stock at least ten in number and having an aggregate par value of at least one thousand dollars; . . . ." 63 N.E.2d at 180.

signed to prevent impairment of capital and consequent loss to creditors in the event of insolvency. The Supreme Court held that the receiver could recover on the notes notwithstanding the director's agreement with the bank. In so holding, the Court stated:

> Since it is by virtue of the statute that respondent's agreement is unlawful and that the benefit of it as a defense to the note is denied; and as the purpose of the statute is to protect creditors of the bank from the hazard of violations of the Act like the present, it is immaterial that the bank's officers were participants in the illegal transaction, or that the receiver has not shown that the creditors have been deceived or specifically injured as the result of the illegal contract. It is the evil tendency of the prohibited acts at which the statute is aimed, and its aid, in condemnation of them, and in preventing the consequences which the Act was designed to prevent, may be invoked by the receiver representing the creditors for whose benefit the statute was enacted. 309 U.S. at 198–99, 60 S.Ct. at 484 [citations omitted].

In *D'Oench, Duhme & Co. v. F. D. I. C.*, 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942), the Supreme Court reaffirmed the *Deitrick* principle that a defendant could not rely on his own wrongful act to defeat the obligation of a note as against the receiver of the bank. The court went on to hold:

> [T]he reach of the rule which prevents an accommodation maker of a note from setting up the defense of no consideration against a bank or its receiver or creditors is not delimited to those instances where he has committed a statutory offense. As indicated by the cases cited in the *Deitrick* case . . ., an accommoda-

tion maker is not allowed that defense as against the receiver of the bank and its creditors, or at times even as against the bank itself, where his act contravenes a general policy to protect the institution of banking from such secret agreements. In some of those cases, the accommodation maker was party to the scheme of deception, in the sense that he had full knowledge of the intended use of the paper. . . . In others he had "no positive idea of committing any fraud upon any one." . . . Yet, he has not been allowed to escape liability on the note as against the receiver even though he was "very ignorant and ill-informed of the character of the transaction." 315 U.S. at 458–59, 62 S.Ct. at 679–680.

As noted in *D'Oench*, recovery was allowed by the bank itself in *Mount Vernon Trust Co. v. Bergoff*, 272 N.Y. 192, 5 N.E.2d 196, 197 (1936), wherein the New York Court of Appeals stated:

> The defendant may not have intended to deceive any person, but, when she executed and delivered to the plaintiff bank an instrument in the form of a note, she was chargeable with the knowledge that, for the accommodation of the bank, she was aiding the bank to conceal the actual transaction. Public policy requires that a person who, for the accommodation of the bank, executes an instrument which is in form a binding obligation, should be estopped from thereafter asserting that simultaneously the parties agree that the instrument should not be enforced.

Professor Corbin similarly writes:

> Whether there has been fraudulent intent or not, it would be scandalous not to enforce payment of the note, if otherwise any depositor or creditor would be a loser.[3] Justification for such enforcement

---

**3.** It is noted that well over 90% of the ultimately allowable claims against DMC alone in its Chapter X case are held by the West Virginia savings and loan subsidiaries to the extent of approximately $5.5 million and by the DMC subordinated debenture holders in the amount of approximately $6.6 million. The class fraud claim filed by the subordinated debenture holders against DMC and the West Virginia subsidi-

aries has been settled for approximately 70 cents on the dollar, their claims having been allowed jointly as against DMC and the West Virginia subsidiaries without subordination. Inasmuch as the assets of DMC are relatively slight, the recovery by the subordinated debenture holders must be derived in the main from assets of the West Virginia subsidiaries, thereby diminishing the recovery of the depositors

can be phrased in terms of "estoppel" or in terms of the action in reliance by various parties. In any case, there has been no consideration in the sense of a bargained-for equivalent. In some cases the court has been content to rest its decision against the promisor on a mere appeal to the prevailing beliefs as to public policy. 1A Corbin, Contracts § 197 (1963).

The defendants contend that they are, in any event, entitled to indemnification by DMC under Article XIV of the by-laws of the corporation as adopted April 21, 1966, providing in pertinent part as follows:

> Any person shall be indemnified and reimbursed by this Corporation for expenses actually and necessarily incurred by him and liabilities imposed upon him in connection with or arising out of any action, suit or proceeding, civil or criminal, or threat thereof, in which he may be involved by reason of his being or having been a director, officer, or employee of this Corporation, or of any firm, corporation or organization which he served in any capacity at the request of the Corporation; provided, however, that no person shall be so indemnified or reimbursed (a) in relation to any matter in such action, suit or proceeding as to which he shall finally be adjudged to have been guilty of breach of duty as a director, officer, or employee of this corporation . . .

It does not appear that this provision was designed to indemnify the defendants against contractual obligations which they might have had with DMC. If there had been no surreptitious side agreement, would the defendants seriously contend that they should be indemnified from the payment of their notes by virtue of the indemnification provision? Apart from the question of

whether the indemnification purports to cover the defendants' notes, and aside from the issue of whether the defendants' conduct constituted a breach of duty, it is plain enough that the defendants cannot escape the application of the doctrine of estoppel merely because the effort of the corporation to protect them from observance of statutory requirements is said to have been enshrined in the corporate by-laws.

The defendants insist, nevertheless, that the Chapter X Trustee is vested merely with the same title to the notes as that of a straight bankruptcy trustee under § 70 of the Bankruptcy Act (11 U.S.C. § 110).[4] The defendants, after citing the general rule that a bankruptcy trustee's title rises no higher than that of the bankrupt, 4A *Collier on Bankruptcy* ¶ 70.04, at 55 (14th ed. 1967), urge that neither DMC nor, therefore, its trustee, could enforce the notes in this case in the face of the defenses already discussed. As earlier observed, recovery may indeed be had by the banking or savings and loan institution itself under circumstances similar to those in this case. *Mount Vernon Trust Co. v. Bergoff*, 272 N.Y. 192, 5 N.E.2d 196 (1936). In any event, the question is not whether the trustee acquires title to the notes by operation of law as successor in title to the debtor in reorganization. Surely he does. Rather, the issue is whether the trustee takes his title burdened with the terms of the illicit agreement or the suggested conditional delivery or the alleged want of consideration. Inasmuch as the doctrine of equitable estoppel applies to suppress all of those defenses, the trustee's title is unencumbered. Any other result would unjustifiably negate the statutory requirement respecting ownership of qualifying shares by industrial savings and loan directors.

holding claims of some $29.6 million against the West Virginia subsidiaries to approximately 95 cents on the dollar. Consequently, the depositors, debenture holders and other creditors of these uninsured subsidiary savings and loan companies would indeed be the losers if payment of the defendants' notes were not enforced. See Chapter X cases of *In re Diversified Mountaineer Corporation, Debtor, et al.* (Bankruptcy Nos. 74-71, 73, 75, 76, 77, 78, 79, 80 and 81 CH) (S.D.W.Va.).

**4.** The Chapter X Trustee's title, rights and powers consist of those held not only by a straight bankruptcy trustee but also those of a receiver in equity appointed by a court of the United States. See § 187 of the Bankruptcy Act (11 U.S.C. § 587) and the order appointing the Chapter X Trustee in the DMC reorganization proceeding (*supra* at n.3) on February 21, 1974.

## II.

The court finds that the applicable statute of limitations does not bar the enforceability of any of the defendants' notes except the Ernest John $1,000 note of January 10, 1963.

Under the Bankruptcy Act, the trustee may, within two years subsequent to the date of approval of a Chapter X petition (or within such further period of time as federal or state law may permit), institute proceedings on behalf of the estate upon any claim against which the statute of limitations had not run at the time of the filing of the Chapter X petition. Bankr.Act §§ 11e, 102, 11 U.S.C. §§ 29(e), 502. In this case, the petition was filed by the debtor and approved by order of the court in February, 1974. The trustee filed these suits in 1975, well within the two-year time span.

The statute of limitations commences to run from the date of execution with respect to promissory notes payable on demand, such as those in issue here. *Steeley v. Funkhouser*, 153 W.Va. 423, 425–26, 169 S.E.2d 701, 703 (1969); *Lightner v. Lightner*, 146 W.Va. 1024, 1033, 124 S.E.2d 355, 361–62 (1962). The applicable statutory period, as conceded by the parties, is ten years. W.Va.Code § 55–2–6 (1961). It is thus clear that the statute is not a bar to action on any of the notes other than the four $1,000 notes executed and delivered to DMC by defendants Savas, Turner, Phillips, and John in January, 1963. By virtue of the West Virginia tolling statute, W.Va. Code § 55–2–17, as well as established principles of equitable estoppel, the court concludes that this suit is not barred as to the four 1963 notes save for the Ernest John note.

A defendant who obstructs the prosecution of plaintiff's claim cannot benefit from his actions by asserting the statute of limitations. Section 55–2–17 states in relevant part:

Where any such right as is mentioned in this article shall accrue against a person who had before resided in this State, if such person shall, by departing without the same, or by absconding or concealing himself, or by any other indirect ways or means, obstruct the prosecution of such right, or if such right has been or shall be hereafter obstructed by war, insurrection or rebellion, the time that such obstruction may have continued shall not be computed as any part of the time within which the said right might or ought to have been prosecuted. (W.Va.Code 1961)

To avoid the statute of limitations, it must be shown "that the cause of action was fraudulently concealed, or that the prosecution of it, in the language of the statute, has been obstructed; specifying the means of obstruction . . . ." *Newberger v. Wells*, 51 W.Va. 624, 638, 42 S.E. 625, 631 (1902) (applying § 55-2-18, W.Va.Code 1868, identical to § 55-2-17 of 1961 Code for all relevant purposes herein).

In *Culbertson v. Jno. McCall Coal Co., Inc.*, 275 F.Supp. 662 (S.D.W.Va.1967), aff'd 495 F.2d 1403 (4th Cir.), *cert. denied*, 419 U.S. 1033, 95 S.Ct. 516, 42 L.Ed.2d 308 (1974), the plaintiff, a partnership in the business of mining coal, brought an action against the defendant, plaintiff's exclusive sales agent, for an accounting of proceeds from sales of coal during July, 1948, through December, 1955. *Id.* at 664. The defendant argued *inter alia* that the action was barred by the applicable period of limitation, either the five or ten-year statute. The plaintiff asserted that the statute was tolled under § 55–2–17 because the defendant had obstructed plaintiff's claim through certain misrepresentations and deceptions with regard to the selling price of the coal. The court found first that the relationship between the parties was of a fiduciary nature since the plaintiff had placed great confidence in the business dealings of the defendant and had relied upon the defendant to deal honestly with it in the sale of plaintiff's coal. *Id.* at 684. In addition, the court found that the plaintiff did not have knowledge of the misrepresentations as to the selling price of the coal, and that the plaintiff was not required under the circumstances to take measures to detect the deception. *Id.* As the court stated, the defendant would not be permitted "to take

the position that Whitewood should have discovered the fraud during the time it was being perpetrated." *Id.* The court concluded that under § 55–2–17, the misrepresentations and concealment by the defendant of the prices for which it was selling plaintiff's coal obstructed plaintiff's right of action against the defendant and consequently the statute of limitations was not a bar to plaintiff's claim. *Id.* at 685.

It is obvious, of course, that the facts in *Culbertson* are dissimilar to the present case. However, *Culbertson* illustrates the appropriateness of an inquiry under § 55–2–17 into the relationship of the parties and the attendant facts. *See also Hundley v. Martinez*, 151 W.Va. 977, 986–89, 158 S.E.2d 159, 164–66 (1967).

By a similar analysis, the court concludes that defendants Savas, Kostas, Turner, White, and Phillips obstructed the enforcement of the four $1,000 notes in question during the time they constituted a majority of the board of directors of DMC. Their majority position on the board, along with that of DMC President Price, existed at least throughout the 1971–73 period. As directors, the defendants were in a fiduciary relationship with the corporation. Nevertheless, in an effort to circumvent the West Virginia and Virginia statutes governing qualifying share requirements for directors of industrial savings and loan corporations, the defendants executed these notes pursuant to a secret arrangement with the president of DMC whereby it was agreed that the corporation would not enforce the notes. Thus, from the date of execution, the defendants intended that the corporation's claim would not be prosecuted. As a majority in control of the DMC Board of Directors at least during the 1971–73 period, they defaulted in their fiduciary duty to the corporation by failing to see that steps were taken to collect upon the notes owing by them.

■ In light of these facts, the tolling of the statute by the application of § 55–2–17 is an equitable solution to what would otherwise be an unjust and harsh result. Indeed, § 55–2–17 is in keeping with equitable principles which have been applied to estop one who is an officer, director, or person in a controlling position of a corporation from asserting the defense of statute of limitations in an action by the corporation to later collect on an obligation of that individual. *Livermore Falls Trust & Banking Co. v. Riley*, 108 Me. 17, 78 A. 980 (1911). *See also Irwin v. West End Development Co.*, 342 F.Supp. 687, 695 n.3 (D.C.Colo.1972), *aff'd in part, rev'd in part*, 481 F.2d 34 (10th Cir. 1973) (affirming use of estoppel to toll statute of limitations); *Dwyer v. Tracey*, 10 F.R.D. 115, 119 (N.D.Ill.1950). In general, the court may exercise its equitable jurisdiction and apply the doctrine of estoppel under appropriate facts to preclude a defendant from utilizing the statute of limitations as a bar, even in the absence of an express statutory basis for tolling the period. *See City of Bedford v. James Leffel & Co.*, 558 F.2d 216, 217–18 (4th Cir. 1977).

■ The court concludes, therefore, that the statute of limitations was suspended as to the three demand notes of Savas, Turner and Phillips at least during the period 1971–73 when the five defendants other than Ernest John, constituting a majority of the DMC Board of Directors, were in control of the corporation and in a position to obstruct collection of the notes. Under W.Va.Code § 55–2–17, this three-year period during which the statute was tolled is subtracted from the period between January, 1963, when the cause of action accrued, and February, 1974, when the bankruptcy reorganization petition was filed and approved. Thus, the statute had not run for the ten-year limitation period by February, 1974, or even by the time plaintiff instituted these suits in May, 1975. Accordingly, the court finds plaintiff's action to be timely filed with respect to the notes of Savas, Turner, and Phillips.

On the other hand, Ernest John was never a director of DMC to whom his $1,000 note of 1963 was owing, but merely served as a director of the savings and loan subsidiary at Chester until 1972. Although the question as to Ernest John is close, the court determines that John, being neither a

162

DMC director nor otherwise in control of DMC at the time the cause of action arose or thereafter, and having withdrawn as a director of the Chester subsidiary in 1972, did not participate in the obstruction of plaintiff's claim, and is entitled to invoke the statute of limitations in bar of the action on his $1,000 note.

Order may be entered accordingly.