FEDERAL SAVINGS & LOAN INS. COR-
PORATION et al. v. THIRD NAT.
BANK IN NASHVILLE.

No. 10619.

United States Court of Appeals
Sixth Circuit.

Feb. 18, 1949.

W. Raymond Denney, and John K. Maddin, both of Nashville, Tenn. (W. Raymond Denney and John W. Maddin, both of Nashville, Tenn., Kenneth G. Heisler, Ray E. Dougherty, and Opal M. Slater, all of Washington, D. C., and R. O. Barnett, of Baltimore, Md., on the brief), for appellants.

John J. Hooker and E. J. Walsh, both of Nashville, Tenn. (John J. Hooker and E. J. Walsh, both of Nashville, Tenn., on the brief), for appellee.

Before ALLEN, MARTIN and MILLER, Circuit Judges.

ALLEN, Circuit Judge.

Federal Savings & Loan Insurance Corporation, hereinafter called the insurance corporation, and the Fidelity and Deposit Company of Maryland, intervenor, hereinafter called the surety, appeal from a judgment of the District Court which limited the recovery of the insurance corporation to $12,766.32, and dismissed the action as to the surety.

The insurance corporation, pursuant to 12 U.S.C., § 1726(a), 12 U.S.C.A. § 1726(a), had insured the Fidelity Federal Savings and Loan Association of Nashville, Tennessee, hereinafter called the association, and after discovery of a shortage in the association's assets amounting to $32,051.35, due to defalcations of Virgil R. Hall, secretary and treasurer of the association, had contributed that amount to restore the impairment in the capital of the association. The association's claims against the appellee, hereinafter called the bank, were duly assigned to the insurance corporation. The action sets up a claim of conversion by the bank of the association's assets, breach of the bank's contract with the association, misrepresentations made to the insurance corporation's examiners by the bank, its liability as a joint tort-feasor with Hall, and its acceptance of trust funds to reimburse itself for personal indebtedness of Hall. The surety filed an intervening petition praying for the recovery of $10,000 paid by it upon a fidelity bond on Hall in favor of the association.

The District Court originally dismissed the action upon the ground of lack of jurisdiction, 60 F.Supp. 110, considering that the case was between citizens of the same state, and presented no violation of Federal law. This court reversed the judgment, 153 F.2d 678, holding that the allegations of the complaint, if proved, established a violation of the provisions of 12 U.S.C., § 1731(e) [now 18 U.S.C.A. § 1008], that civil sanctions lie for such violations, and that the case therefore arises under federal law.

While the claimed shortages amounted to over $50,000, the insurance corporation

limited its prayer for recovery to the amount contributed, namely, $32,051.35. Upon the trial the District Court granted recovery to the insurance corporation upon the third and fifth claims of the complaint only, totalling $12,766.32, and dismissed the action as to the surety company. The bank does not appeal from the judgment against it.

The appeal attacks so much of the judgment as disallows $18,484.13 of the recovery sought, and interest, and as dismisses the intervening petition of the surety.

The insurance corporation set up the following claims of relief in its complaint, as amended:

(1) For the sum of $10,000 because of the improper charge by the bank on September 20, 1940, of the unauthorized check dated September 10, 1940, against the association's account, and the illegal conversion of this sum to pay the personal indebtedness of Hall to the bank.

(2) For the sum of $15,945.66 because of the improper charge-back by the bank on September 13, 1940, of the two checks dated September 10, 1940, which it had accepted as a deposit to the association's account on September 10th or 11th.

(3) For the sum of $10,000 because of the improper charge by the bank on October 9, 1940, of the unauthorized check dated September 26, 1940, against the association's account, and the illegal conversion of this sum to pay the personal indebtedness of Hall to the bank.

(4) For the sum of $11,456.83 for fraud and deceit of the bank practiced on the insurance corporation's examiners in connection with the 1940 examination and audit of the association in violation of the provisions of § 1731(e), 12 U.S.C. [now 18 U.S.C.A. § 1008], which sum was embezzled after the insurance corporation was prevented from discovering Hall's shortages by the bank's false statement and certificate.

(5) For $3,000 on the Daniel Wakefield Hale note and mortgage belonging to the association which was taken as collateral by the bank for a personal loan to Hall.

(6) For $32,051.35 (limited by the testimony to $31,250.95) for the fraud, deceit and misrepresentation by the bank to the insurance corporation's examiners, and the illegal course of conduct and dealings adopted by the bank with Hall in dealing with the funds, accounts and records of the association from July 12, 1939, to January 31, 1941, in violation of § 1731(e), 12 U.S. C. [now 18 U.S.C.A. § 1008].

(7) For the sum of $12,660.20 because of the improper charge-back of the Wrenne check against the association's account on October 10, 1940, after the bank had accepted it as a deposit on September 27, 1940, and the bank's actions in connection therewith.

A further claim for $3,029.25 was presented at the trial based upon the fact that the bank accepted the Alma Lewis check, on a forged and restricted endorsement, as a deposit to the Allen & Hall Realty Company's account, and that the amount thereof was transferred on the same day to the bank by check to pay Hall's personal indebtedness.

The bank, in addition to general denials, claimed that certain of the deposits were conditional; that no damage was shown, and that the bank was absolved of liability because of the negligence of the association.

Appellant's contention here is that the conceded facts establish the right of the insurance corporation to recover upon all of the claims set forth in the complaint. It urges that the following facts, on which it bases its claims, are established by the evidence.

The association was organized in May, 1937, with Virgil R. Hall its secretary and treasurer and dominant executive officer. Neither the president nor any member of the board of directors ever checked Hall's financial transactions. The minutes of the directors' meetings, which were required to be held monthly, were often omitted and Hall would write them up from memory for the purpose of examination by the examiners of the insurance corporation. The association carried its chief bank account in the bank, and its signature card on file with the bank during the entire period provided that the authorized signature of the association should be by Virgil R. Hall, with a counter-signature by G. A. Harring-

ton, president, or J. L. Blakemore, vice-president.

During the same period Hall managed and in part owned the Allen & Hall Realty Company. The bank carried the account of Virgil R. Hall, Agent, the account of Allen & Hall Realty Company, and the account of the association, all of which were handled by D. W. Johnston, assistant vice-president and assistant cashier of the bank. Johnston and Hall were old acquaintances, both having come to Nashville from Dickson County, Tennessee. All transactions of the association with the bank that were not of a routine nature were handled by Johnston, and, in general, in accordance with the requests and instructions of Hall.

On July 13, 1939, the examiner of the insurance corporation, acting under the statute (12 U.S.C., § 1724 et seq., 12 U.S.C.A. § 1724 et seq.), came to the association's office to audit its accounts. The bank gave the examiners a certificate dated July 13, 1939, showing the association's balance in the bank at closing on July 12, 1939, to be $34,163.89. A bank statement was submitted with the certificate showing the same balance and including a deposit of $18,462.-69, shown in the statement to have been made July 12, 1939. The deposit slip, dated July 10, 1939, included two checks for $2,951.32 and $4,003.96 respectively, drawn on the Allen & Hall Realty Company's account in the bank. When these checks were charged to the Realty Company on July 14, 1939, its account was overdrawn in the sum of $7,117.37. The deposit also included $11,000 cash, the proceeds of a loan made by the bank to the Realty Company with no security except Hall's personal endorsement. The bank's records showed that this loan was made on July 14. The examiners, after receiving the statement and certificate, found the association's account to be in balance. On August 4th the Allen & Hall loan of $11,-000 was paid in full, and on the same day Hall set up two loans on the association's books, which together with the one set up on July 24, totaled $12,200. During the period from July 14th to July 24th, except for two days, the Realty Company's account was overdrawn from $2,000 to $7,000.

For a number of years Hall's account had an average daily balance of about $50, and never exceeded $300. From July 26, 1940, to September 19, 1940, his balance was $5.51.

On September 11, 1940, the examiners again came to the association's office for an examination and audit. They took the cash in the office, counted it, requested a statement of the association's account, and left the regular certificate form with the bank to ascertain the amount on deposit to the association's credit at closing on September 10th.

Hall's loans at the bank on September 19, 1940, aggregated $12,660.20, and he was short in his cash accounts as treasurer of the association in the amount of $25,945.66. Hall made two deposits to the credit of the association in the bank, as he states, on the morning of September 11, 1940, one for $13,297.52, the other for $17,816.49. The books of the bank show that these deposits were made on September 11th, and Hall made them, as he says, knowing that the examiners "were in the vicinity of Nashville."

Included in the deposit of $13,297.52 was $10,000, listed as currency, which represented the proceeds of a personal loan to Hall made at that time by the bank. The note given for the loan was dated September 10, 1940. Johnston did not refer this loan in advance to the bank's loan committee, as was customary, and he approved it after Hall told him he was "about due for an examination." Hall at the same time drew a check for $10,000 on a counter check of the bank dated September 10, 1940, payable to the bank. This check was drawn on the association's account and signed by Hall without countersignature. It was charged against the association's account by the bank on September 20, 1940, and Hall's note was paid with the proceeds.

The $17,816.49 deposit included two checks drawn by Hall on his account in the bank, one for $9,040.25 and the other for $6,905.41. On September 13th the bank charged the two checks, not against the Hall account, but against the association's account and then returned the checks to Hall. On the certificate form which the

examiners had submitted the bank certified that $32,470.52 was on deposit to the credit of the association at closing on September 10, 1940. The statement showed the same amount and listed the two deposits made by Hall as having been made on September 10th. However, the bank's books showed the deposits as having been made on September 11th, and showed a balance of $1,356.51 at closing on September 10th. Moreover, the $10,000 check was not listed as an outstanding liability of the association in the space provided on the certificate for this information.

Using the figures certified, the examiners found the books of the association to be in balance. They interrupted their examination and left Nashville on September 17th. They reappeared in Nashville on September 26, 1940, again counted the cash, and requested a certificate from the bank as to the amount on deposit to the association's credit at closing on September 25, 1940, together with a bank statement from September 11 through September 25.

At the request of Hall, and with the knowledge and authorization of Johnston, the bank prepared and furnished the examiners a statement which omitted the September 13 and September 20 charges of $15,945.66 and $10,000 respectively. This made the closing daily balances on the statement which the bank prepared and furnished the examiners differ from the bank's records as follows:

| LEDGER CARD MAINTAINED BY BANK | | STATEMENT PREPARED BY THE BANK AND FURNISHED EXAMINERS |
|---|---|---|
| Sept. 10 | $ 1,365.51 | $32,470.52 |
| Sept. 11 | 31,826.07 | 31,826.07 |
| Sept. 13 | 15,852.31 | 31,797.97 |
| Sept. 14 | 15,814.23 | 31,759.89 |
| Sept. 16 | 15,686.23 | 31,631.89 |
| Sept. 20 | 4,426.23 | 30,371.89 |
| Sept. 23 | 4,416.23 | 30,361.89 |
| Sept. 25 | 4,216.23 | 30,161.89 |

The certificate handed the examiners by the bank stated that $30,161.89 was on deposit to the credit of the association at closing on September 25, 1940. It was the practice of the bank to give statements to examiners and customers desiring them

which were exact duplicates of the bank's records. The certificate form furnished by the examiners expressly asked for "balance in regular checking account at closing (effective date of examination) September 25, 1940." No outstanding obligations were listed and, while the cancelled checks which supported the charges shown on the statement were given the examiners, the cancelled check for $10,000 which the bank had charged against the association's account on September 20 was not given them.

The association's ledger account in the bank shows two deposits, one for $15,945.66 and one for $10,000, made on September 26, 1940. The deposit slip lists a $10,000 item and a $15,945.66 item, the proceeds of loans made to Hall personally. Hall told Johnston at the time he deposited the $15,945.66 that the examiners were there and he wanted his assets to appear better than they did. Later in the day Hall came back and said "I must fix that Fidelity Federal note" and borrowed $10,000 more. Hall again gave the bank as security for his $10,000 note a counter check signed by him on behalf of the association without countersignature, drawn on the bank and payable to it, dated September 26, 1940. This was charged to the association's account on October 9, 1940, and the proceeds used to pay Hall's note to the bank. The collateral furnished to secure the note covering the deposit of $15,945.66 consisted of notes and mortgages, but the bank kept no record describing these. One of them was later shown to be a $2,700 note payable to the association executed by Daniel Wakefield Hale, secured by a recorded first deed of trust on the property therein described. Hall had endorsed the note to the bank purportedly for the association. A substantial part of this loan was repaid by checks drawn upon the Allen & Hall Realty Company's account, and checks in amounts identical with the Allen & Hall deposits were charged against the association's account.

On or about September 13, 1940, Hall marked the three loans, now aggregating $12,660.20, "paid," and placed a check of the Wrenne Mortgage Company drawn upon the bank, dated September 13, 1940, for $12,660.20 with the other cash items in the

association's office. Wrenne left the check with Hall with the understanding that it would not be cashed until a sale of certain mortgages was completed and the mortgages turned over by Wrenne to customers who were available, as otherwise there would not be sufficient on deposit to cover. The examiner conducting the 1940 examination caused the association to deposit all the cash items found in the office when he returned, including this check, and accompanied Hall to the bank when the deposit was made on September 27, 1940.

Wrenne testified that Hall telephoned him on the morning of the 27th that the examiners had deposited the check; that he and Hall went to the bank that morning and that he told Cockrill, the bookkeeper that the check was deposited by mistake, that the purpose of the check had not been consummated and that he did not want it paid; that he then went back to his office leaving Hall at the bank. He did not secure the check nor sign a stop payment order.

Cockrill testified that Wrenne and Hall brought the check to him and Hall requested him to "pay" it but not to show it to any of the officers because he did not want to embarrass Mr. Wrenne who would make a deposit that afternoon or the next day to cover. Cockrill showed the check to Johnston and told him of Hall's request. The check was credited to the association's account on the bank's books as of September 27, 1940, and debited to the association on October 10, 1940. At no time between September 27 and October 10 were there sufficient funds in the account of the Wrenne Mortgage Company to pay this check.

Johnston testified that between September 27 and October 10 the Wrenne check was carried as a bank asset. The bank's auditor testified that it was carried as a cash item by the bank to balance the credit to the association's account. The September 30th bank statement rendered the association included the amount of the Wrenne check in the September 30th balance.

Bradrick, the examiner, questioned Johnston a few days after the check was deposited to ascertain whether it had cleared. He testified:

"It being the major portion of that deposit and being one check, it is customary to determine whether or not it had cleared and was paid, and after allowing a reasonable time for that to take place I called at the office of the Third National Bank * * * and was referred * * * to Mr. Johnston * * * and he advised me that it was involved in a real estate transaction and would be cleared in the course of a day or two, and either I suggested or he did that I call back, which I did in the course of two or three days, I don't recall which. At that time I contacted Mr. Johnston directly and it happened, as I recall that meeting, that he was occupied at the time with a gentleman at his desk, and when he turned to me he volunteered the information before I asked for it that the check, that that matter, was closed and I inquired specifically whether or not the particular check I was interested in had cleared and he told me it was in that day's business and was a closed matter as far as the Fidelity Federal was concerned, which I accepted as a fact.

"Q. You said 'a closed matter as far as the Fidelity Federal was concerned,' did he make that statement to you? A. That is the meaning I placed upon it. He said it was in that day's business and the matter was closed.

"Q. His exact words were that it was in that day's business? A. That is right."

Both Bradrick and Smith, another examiner in charge of the 1941 examination, testified that Johnston told them in the presence of each other and of the attorney for the association, during the January, 1941, examination that it was his intention in the last conversation he had with Bradrick about the Wrenne check to leave the impression that the check was good. Johnston puts a different interpretation on the conversation. The examiners completed their audit and left Nashville on October 5th. The check was debited to the association on October 10th. The examination disclosed no shortages except an item of $340.50.

On October 28th, $6,000 was paid by check of the Realty Company as a credit on Hall's loan of $15,945.66. This included the proceeds of an association check for $3,029.25, properly drawn and countersigned, payable to Alma Lewis, to be delivered to her in connection with a loan upon the property already encumbered with the Hale mortgage. The Lewis loan was entirely fictitious and never consummated, but Hall set it up on the association's books and deposited the check in the Realty Company's account in the bank. The endorsement of Alma Lewis' name was forged.

In January, 1941, Hall admitted to Johnston that there were discrepancies in the association's office accounts, and later admitted substantial shortages. An audit of the books as of the close of business on January 31, 1941, disclosed a gross cash shortage of $38,626.27, and a net cash shortage of $31,250.95. The insurance corporation prays for recovery only of the amount of its contribution plus interest.

At the conclusion of the evidence, each party moved for directed verdict. The District Court considered that there was "hardly any dispute about the facts," saying, "In connection with the two $10,000 checks and the transactions that took place about that time, there was no dispute about the facts in those instances. The only dispute in this case was whether or not the bank was acting fraudulently or in good faith in connection with the Wrenne check. * * *" The court then decided a number of questions of fact, and held that the appellant was entitled to recover on claims 3 and 5 of the amended complaint, totaling $12,766.32, and denied recovery on the other claims. It subsequently stated that the jury's verdict on the question of good faith "would have a great deal to do with whether or not I allow interest on these items which I have already indicated that the Bank is liable for." The court accordingly submitted to the jury the following questions:

"1. Did the Third National Bank or any officer thereof intentionally do any act tending to deceive the Examiners about the true condition of the Fidelity Federal Savings & Loan Association, or did the Third National Bank and its officers act in good faith in these transactions?

"2. Did the Third National Bank or any officer thereof do any act which was the proximate cause of any loss to Fidelity Federal Savings & Loan Association arising out of the handling of a check of Thomas A. Wrenne & Company?"

The jury found in favor of the bank upon both questions.

On August 15, 1947, the court entered a decree, reciting the verdict of the jury, overruling the insurance corporation's motion for findings of fact and conclusions of law, and directing "that the record now show that the jury was directed to return a verdict in favor of the plaintiff in said sum of $12,766.32, and that a judgment be entered upon such verdict of the jury." Interest was denied on the amount of the recovery, and since the claim of the surety was subordinate to the claim of the insurance corporation, and the judgment rendered was less than the amount of the insurance corporation's superior claim, the intervening petition of the surety was dismissed.

The applicable statute is § 1731(e), 12 U.S.C. [now 18 U.S.C.A. § 1008], the material portions of which are as follows: "Whoever, for the purpose of inducing the insurance of the accounts of any institution by the Federal Savings and Loan Insurance Corporation or for the purpose of obtaining any extension or renewal of such insurance by said Corporation or for the purpose of influencing in any way the action of the said Corporation under this chapter, makes, passes, utters, or publishes, or causes to be made, passed, uttered, or published, any statement, knowing the same to be false * * *, or willfully overvalues any security, asset, or income, of any institution insured or applying for insurance by said Corporation, shall be punished by a fine of not more than $5,000, or by imprisonment for not more than two years, or both."

In an action to enforce civil penalties based upon a violation of § 1731(e), the motive of the bank is immaterial. As held in D'Oench, Duhme & Co. v. Federal Deposit Ins. Corp., 315 U.S. 447, 460, 62

S.Ct. 676, 681, 81 L.Ed. 956, a case which construes a similar section of the Federal Reserve Act [§ 264(s), 12 U.S.C. [now 18 U.S.C.A. § 1007], the test here is whether the false statements were designed "to deceive the creditors or the public authority, or would tend to have that effect." Also, if the making of the statements was shown, and that they were false, together with the fact that the public authority was deceived or tended to be deceived, the bank was liable for the deposits which it credited to the association, regardless of specific damage. Deitrick v. Greaney, 309 U.S. 190, 198, 60 S.Ct. 480, 84 L.Ed. 694.

Also pertinent are the following general rules of law applicable to banking transactions:

■■■ When a bank unconditionally deposits checks drawn on itself to the credit of a depositor, the effect is the same as if it had cashed the checks and deposited the proceeds. When a check is presented for deposit, drawn on the depositary bank, the bank may refuse to pay it, or take it conditionally by express agreement or by usage, if usage exists; but if it pays the money or gives credit to the depositor, the transaction is closed between the bank and the depositor unless the check proves to be not genuine or there is fraud against the bank on the part of the depositor. The giving of credit is practically and legally the same as paying the money to the depositor and receiving the cash again on deposit. American National Bank of Nashville v. Miller, 229 U.S. 517, 520, 33 S.Ct. 883, 57 L.Ed. 1310; National Bank v. Burkhardt, 100 U.S. 686, 689, 25 L.Ed. 766; In re Ruskay, 2 Cir., 5 F.2d 143; Lebanon Bank & Trust Co. v. Grandstaff, 24 Tenn. App. 162, 141 S.W.2d 924; 2 Morse on Banks and Banking (6th Ed.), § 569.

A bank cannot look to the depositor of the check for reimbursement. It may only charge the drawer of the check. Hayes v. Tootle-Lacy National Bank, 10 Cir., 72 F.2d 429, 432; American National Bank of Nashville v. Miller, supra.

■■■ Also, when a bank pays a debt owed by an individual to the bank with a corporate check drawn by the individual debtor, the bank becomes liable for conversion. National Bank v. Insurance Co., 104 U.S. 54, 26 L.Ed. 693; U. S. Fidelity & Guaranty Co. v. Union Bank & Trust Co., 6 Cir., 228 F. 448; Grace v. Corn Exchange Bank-Trust Co., 287 N.Y. 94, 105, 38 N.E.2d 449, 145 A.L.R. 436. When it has notice that the checks of a corporation are issued for a third party's personal use, it pays the checks at its peril. Havana Central R. Co. v. Central Trust Co., 2 Cir., 204 F. 546; Federal Savings & Loan Ins. Corp. v. Kearney Trust Co., 8 Cir., 151 F.2d 720.

The bank insists that it is not liable because the defalcations of Hall and the negligence of the association in failing to place any check on Hall's activities were the proximate cause of the loss, and that if it is liable for the items upon which judgment was given against it, the findings of the jury cleared it of further responsibility. The bank did not appeal from the judgment and hence the question of its complete nonliability is not preserved.

■■■ Nor do the findings of the jury release the bank from responsibility. D'Oench, Duhme & Co. v. Federal Deposit Ins. Corp., supra, 315 U.S. at page 460, 62 S.Ct. 676, 86 L.Ed. 956; Deitrick v. Greaney, supra, 309 U.S. at page 198, 60 S.Ct. 480, 84 L.Ed. 694.

■■■ The insurance corporation contends that under the undisputed evidence judgment should have been rendered in its favor on all items involved. We think that the judgment must be reversed and a new trial ordered. This record presents evidence, much of it documentary and from the bank's own records, tending to show that the bank violated § 1731(e), 12 U.S.C. [now 18 U.S.C.A. § 1008], and is therefore subject to civil sanctions arising thereunder, Federal Savings & Loan Ins. Corp. v. Third National Bank, 6 Cir., 153 F.2d 678; also evidence to the effect that the bank breached its contract of deposit; and that the bank gave substantial assistance to Hall in his wrongdoing and thus became joint tort-feasor with Hall, to the damage of the association.

The District Court failed to consider in its findings or to submit to the jury any question arising out of the violation by the

bank of § 1731(e), 12 U.S.C., 12 U.S.C.A. § 1731(e), although this court had previously held in this case that the federal court has jurisdiction of civil sanctions under § 1731(e), 12 U.S.C. [now 18 U.S.C.A. § 1008] [153 F.2d 678], and had indicated that a cause of action under that section was stated, and thus had established the law of the case. Appellant's evidence on this phase of the controversy has been previously reviewed, and presented a jury question under appropriate instructions.

█ The fact, if established, that the bank intentionally made false certificates which padded the assets of the association, and thus covered up shortages, as the District Court found, "with the purpose of assisting Hall," constitutes a violation of § 1731(e), 12 U.S.C. [now 18 U.S.C.A. § 1008]. The bank is presumed to intend the natural and probable consequences of its acts, and proof of motive was unnecessary. Dunlap v. United States, 7 Cir., 70 F.2d 35.

Also evidence was given tending to establish damage in the amount of at least $50,000. Between September 10, 1940, and January 1, 1941, the bank charged this amount to the association's account, having already credited it to the association on checks or obligations of other persons.

█ The theory advanced by the bank that the giving of the two checks for $10,000 each, drawn by Hall on the association's account, constituted in each case a bona fide conditional deposit, presents a question for the jury.

Each of the checks was entered by the bank in the association's account and in the bank statements presented to the examiner with each certificate the bank showed the items as listed to the credit of the association. The association later checked out on these deposits in the ordinary course of business. It was a question for the jury whether by its statements and certificates the bank evidenced a clear intention to treat the transactions as payment of money and receipt of the cash on deposit and hence is estopped to assert that these records do not reflect the true transaction. Cf. Deitrick v. Greaney, supra.

The same considerations apply to the Wrenne Realty Company check for $12,660.20. While between Wrenne and the bank the deposit of this check was conditional, it is a question for the jury whether the deposit was absolute or conditional between the bank and the association.

█ The finding of the jury on the first question submitted to it must be vacated because the question was submitted in improper form. The question should present the issue of whether the bank made the statements and certificates for one of the purposes specified in the statute "knowing the same to be false" as required by the wording of the statute.

█ The question so drawn corresponds exactly to the provisions of § 1731(e), 12 U.S.C. [now 18 U.S.C.A. § 1008], and the ruling of the Supreme Court in D'Oench, Duhme & Co. v. Federal Deposit Ins. Corp., supra, 315 U.S. at page 460, 62 S.Ct. 676, 86 L.Ed. 956. The statute does not require evidence of bad faith in such transactions, and the inclusion of this requirement in the first issue submitted to the jury was material error requiring the setting aside of the verdict upon that point.

The judgment is reversed, and the case is remanded for new trial upon all claims except 3 and 5 with direction to the District Court to charge the jury, in accordance with this opinion, upon all issues of fact submitted to it.