## In re FITZGERALD, De ARMAN & ROBERTS, INC., Debtor.

P. David NEWSOME, Jr., Trustee for the Liquidation of Fitzgerald De Arman & Roberts, Inc., Plaintiff,

v.

Charles P. CULP, Defendant.

Bankruptcy No. 88–01859–W (SIPA).
Adv. No. 90–0045–W.

United States Bankruptcy Court, N.D. Oklahoma.

July 16, 1991.

J. Denny Moffett, Conner & Winters, Tulsa, Okl., for trustee.

Charles P. Culp, pro se.

Theodore H. Focht, Gen. Counsel, Securities Investor Protection Corp., Washington, D.C., for SIPC.

## ORDER GRANTING PARTIAL SUMMARY JUDGMENT

MICKEY DAN WILSON, Bankruptcy Judge.

Upon consideration of the record in the above-styled adversary proceeding, and in Case No. 88–01859–W In re Fitzgerald, De Arman & Roberts, Inc., the Court determines, concludes and orders as follows.

On June 28, 1988, the Securities Investor Protection Corporation ("SIPC") filed its application for a protective decree, com-

mencing Case No. 88–C–601–C, *Securities and Exchange Commission v. Fitzgerald, De Arman & Roberts, Inc.,* in the United States District Court for the Northern District of Oklahoma. On the same day, that Court entered its Order finding that the customers of Fitzgerald, De Arman & Roberts, Inc. ("FDR") were in need of the protections afforded by the Securities Investor Protection Act, 15 U.S.C. §§ 78aaa–78*lll* ("SIPA"); appointing P. David Newsome, Jr., as Trustee; and ordering the removal of said case to the Bankruptcy Court for the Northern District of Oklahoma. By Order filed June 29, 1988, the Bankruptcy Court accepted the removal of the case; appointed P. David Newsome, Jr., as Trustee; and directed that the case be conducted in accordance with 11 U.S.C. Chapters 1, 3 and 5 and subchapters I and II of 11 U.S.C. Chapter 7 as set forth in SIPA, § 78fff(b).

Such a case resembles a cross between an involuntary "straight liquidation" bankruptcy and the type of bank receivership made familiar by the operations of the Federal Deposit Insurance Corporation ("FDIC"). This unusual form of relief is applied neither to ordinary debtors nor to banks, but only to stockbrokers and dealers (hereinafter simply "brokers"). The governing statute is Title 15, U.S.Code (SIPA), which in turn adopts portions of Title 11, U.S.Code (the Bankruptcy Code). Although the named plaintiff is the Securities and Exchange Commission ("SEC"), SIPC initiates the case and obtains appointment of a receiver for the "bankrupt" broker. The receiver is called a Trustee, enjoys many of the powers wielded by trustees in bankruptcy, and uses the Bankruptcy Court as a forum for his activities; but he also acts in some ways as an agent of SIPC. Customers of the broker may be compensated for their losses by funds made available by SIPC—like bank insurance under the Federal Deposit Insurance Act ("FDIA"), and (alas) unlike ordinary bankruptcy cases in which creditors can be paid, if at all, only from the residue of the debtor's own property. However, a Trustee in a stockbroker case does proceed to liquidate the broker's assets, to enhance distribution to customers and creditors or to reimburse SIPC for its own distributions to customers. Customers and creditors of the broker do not file proofs of claim with the Bankruptcy Clerk; but they do submit a type of claim directly to the Trustee. Disputes concerning such claims are determined by the Bankruptcy Court.

On or about December 10, 1988, a certain "Creditor Claim" was submitted to the Trustee. Said claim read in pertinent part as follows:

Name of Creditor
[Type or Print]
Mailing Address

Charles P. Culp
Investment Concepts, International
604 W. Noble
Drumright, OK 74030
City State Zip Code

Taxpayer I.D. Number (SSN)_____

2. The Debtor was, at the time of the filing of the petition initiating this case, and still is indebted [or liable] to this claimant, in the sum of $ 5,000.00 .

3. The consideration for this debt [or ground of liability] is as follows: June Payroll .

5. [If appropriate] This claim is founded on an open account, which became [or will become] due on 6/30/88 , . . .

8. This claim is not subject to any setoff or counter-claim except

_____

$ 5,000.00
Total Amount Claimed

Name of Creditor:

Investment Concepts International, Inc.
(Print or Type Full Name of Creditor)

Dated:

12/10/88

Signed: Charles P. Culp
Title: Pres.

_____

See Complaint Exhibit A.

On February 8, 1990, the Trustee filed his complaint against Charles P. Culp ("Culp;" "respondent"), commencing this adversary proceeding. Said complaint was titled "Objection to Creditor Claim Submitted by Charles P. Culp and Counterclaim." The complaint alleges that Culp is president of Investment Concepts International ("ICI"); that the claim submitted on or about December 10, 1988, by Culp for ICI is for Culp's work and wages; that there is no difference between Culp and ICI; and that the actual claimant is Culp himself. The Trustee objected to Culp's claim on the ground that it is subject to setoff. As the basis for setoff, the Trustee counter-claimed for payment of a note made by Culp in favor of FDR. The note reads in pertinent part as follows:

## NEGOTIABLE PROMISSORY NOTE

Effective Date: April 19, 1988
County and State: Tulsa, Oklahoma

MAKER: Charles P. Culp

PAYEE: Fitzgerald, DeArman & Roberts, Inc.
 6400 South Lewis
 Tulsa, Oklahoma 74136

Principal Amount: $560,181.01
Interest Rate: None
Number of Payments: One
Amount of Payment: $560,181.01
Date of Payment: April 19, 1989

CONSIDERATION. For value received the Maker promises to pay to the order of Payee the principal amount at the rate of interest and according to the terms stated herein.

. . .

NON–PAYMENT. Should any payment of principal and interest due hereunder not be paid as it matures, the amount of such installment which has matured shall, at the option of the holder of this Note, bear interest at the maximum legal rate from its maturity date until paid.

ACCELERATION. Should default be made in payment of any installment when due, then the total sum remaining unpaid hereunder shall become immediately due and payable at the option of the Payee or holder of this Note and bear interest at 1.5% over First Tulsa's prime rate per annum until paid. . . .

COLLECTION FEES. Should this Note be placed in the hands of an attorney for collection, Maker agrees to pay reasonable collection costs including reasonable attorney's fees therefor, whether or not suit is brought hereon. In the event of court action, said costs and fees shall be determined by the court. All costs and fees shall be added to the principal amount and bear interest at the same rate as on said principal.

COLLATERAL SECURITY. This note is secured by 222,600 shares of the common stock of Goldcor, Inc., a portion of which is registered in the name of Investment Concepts International, Inc., which is wholly owned by Maker. Maker represents that he has full corporate power to pledge such shares. . . .

 MAKER:

 [signature] Charles P. Culp
 Charles P. Culp

---

See Complaint Exhibit D.

The Trustee seeks to recover not only the principal amount of the note, but "interest from and after April 20, 1989, at the maximum legal rate until fully paid, the Trustee's reasonable attorney's fees and all . . . costs of this action," Complaint p. 3 ¶ 4.

On February 28, 1990, Culp filed his answer *pro se* (misleadingly titled "Objection to Claim and Counterclaim Submitted by Trustee"). For purposes of this order, allegations of fact in Culp's answer are presumed to be true.

On April 23, 1991, the Trustee filed his "... Motion for Summary Judgment" and a "Brief in Support ..." thereof. On May 9, 1991, SIPC filed its "Memorandum ... in Support of the Trustee's Motion for Summary Judgment." SIPC is not named as a party to this adversary proceeding, and has not been granted permission to appear as *amicus curiae;* but SIPC is deemed a party to this proceeding by virtue of 15 U.S.C. § 78eee(d). Culp has filed no response to the motion for summary judgment and briefs in support thereof.

 Summary judgment means judgment without trial. It is granted only when it is clear that there is no need for a trial, because there are no genuine issues of fact to be tried and the legal result of the known facts is clear. Although Culp has filed no document opposing the Trustee's motion for summary judgment, Culp's general position is made quite clear by his well-written answer. This Court will not grant summary judgment merely in default of a response, *In re Curtis,* 38 B.R. 364, 367 (B.C., N.D.Okla.1983); *Miller v. Dept. of the Treasury,* 934 F.2d 1161 (10th Cir. 1991). With or without the help of a response, the Court will consider whether or not the motion itself is sufficient to overcome the answer. Normally, the Court does not weigh conflicting evidence in ruling on a motion for summary judgment; but the Court may grant summary judgment if the evidence is clearly of such "caliber or quantity" that a trial could only result in a directed verdict for the movant, so that there is no *genuine* issue for trial, *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 254, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986).

Culp argues that, if anyone is liable on the note, it is ICI, not Culp personally, Answer p. 6 ¶ 7. But Culp, not ICI, is maker and signer of the note. Therefore Culp is liable on the note, if anyone is. There can be no genuine issue on this point.

 One of the requirements of setoff is mutuality of obligation, *In re Petros Energy & Land Corp.,* 54 B.R. 432 (B.C., N.D.Okla.1985); *In re Republic Financial Corp.,* 47 B.R. 766 (B.C., N.D.Okla.1985); 20 AM.JUR.2D (1965) "Counterclaim, Recoupment, and Setoff," §§ 74ff. The note is between Culp and FDR. The claim is somewhat ambiguous, but appears to be between ICI and FDR. If Culp and ICI are separate entities, then there is no mutuality of obligation—that is, FDR's obligation to ICI cannot be set off against Culp's obligation to FDR. The Trustee proposes that Culp and ICI should not be considered separate entities, but are effectively one and the same. Culp admits that ICI is a close corporation which was "instituted by me at the suggestion of an officer and board member of FDR as well as my CPA ... to provide protection for me against claims such as those now being made by the Trustee, as well as to provide me with certain tax advantages," answer p. 2 ¶ 3. Culp says that "So far as I am aware, this is a proper and legal business arrangement;" but he makes it clear that all material events concern "*my* activities ... on behalf of FDR," answer pp. 2–3 ¶¶ 3, 5 (emphasis added). Culp says that ICI is liable on the note; yet the note is made and signed by Culp personally. The note says it is secured by stock owned in part by ICI and that ICI is "wholly owned" (and obviously is wholly controlled) by Culp; while Culp says the note is secured by "personally owned stock," answer p. 3 ¶ 7. It appears that Culp himself does not clearly distinguish between his affairs and ICI's; and that, for all practical purposes, ICI is merely an alter ego of Culp. There is no evidence at all that ICI ever behaved as if it had any identity of its own, separate and apart from Culp's individual affairs. Under such circumstances, a court of equity can and should "pierce the corporate veil" and treat the affairs of the corporation as if they were the affairs of the individual— as, in fact, they are, 18 AM.JUR.2D (1985) "Corporations" §§ 42–54. Therefore, both the claim and the note are between Culp and FDR. There can be no genuine issue on this point.

 Culp argues that he should not be held liable on the note he made and signed, for reasons of "fairness." He says that his

activities as a " 'market maker' " resulted in " 'trading losses' . . . on behalf of FDR," answer pp. 2–3 ¶ 5; that those trading losses created "a deficit in the company's books in computing the 'net capital' of FDR," p. 3 ¶ 5; that "management was concerned with the results of such a computation," *id.;* that "The reason for the note, as explained to me by them [management], was only to offset the trading losses," *id.;* that "I made the note as a service to the company, having been assured that management would not make any effort to recover, in any way, from my having made this note," p. 3 ¶ 6; and that "FDR management kept their word by never making any effort to make any such recovery," *id.* Culp admits that "FDR eventually failed to maintain a proper 'Net Capital Ratio,' and that this failure was a primary cause of the S.E.C. closing FDR," p. 5 ¶ 12. Culp professes ignorance of legal technicalities but has "always believed that the law is based on equality and fairness," and "the fairness of my position is plain to see," p. 5 ¶ 3.

The Trustee agrees that the law should be fair. But the Trustee has a different idea of what fairness is under these circumstances. The Trustee argues that, since Culp helped FDR wrongfully cover up its net capital deficit by creating a fake asset—a note that would never be collected—Culp should not be allowed to set up FDR's wrongful promise not to collect as a defense to suit on the note. This amounts to the proposition that the rule of *D'Oench, Duhme & Co. v. FDIC,* 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942), originally applied in favor of FDIC, should be extended and applied in favor of SIPC here.

The so-called *D'Oench, Duhme* doctrine actually started with *Deitrick v. Greaney,* 309 U.S. 190, 60 S.Ct. 480, 84 L.Ed. 694 (1940). In that case, a bank bought some of its own shares to inflate its apparent capital resources, and covered up the scheme with the help of a note made by a bank director in favor of the bank. These actions were illegal and were probably criminal, *id.,* 309 U.S. pp. 194–195, 198–199, 60 S.Ct. pp. 482–483, 484, 84 L.Ed. pp. 697–698, 700. Later, the bank entered receiver-

ship; and the bank's Federal receiver brought a civil suit on the note against the bank director. The District Court ruled that the director "was estopped to deny liability on the note," *id.,* 309 U.S. p. 193, 60 S.Ct. p. 482, 84 L.Ed. p. 697. The Court of Appeals of the First Circuit reversed, ruling that "the circumstances . . . did not preclude the defense of want of consideration to the demand of the receiver, more than to that of the bank itself," *id.* The U.S. Supreme Court reversed the Court of Appeals. Mr. Justice Stone for the majority wrote that there was not technically an estoppel because there was no showing of reliance causing actual harm to any particular individual; but, given the objective of the Federal statutes to prevent and police wrongful *conduct* of just this sort, any defense based on the forbidden conduct must be precluded. The exact nature of the doctrine—non-traditional estoppel, or creative discovery of sufficient consideration (see *id.,* 309 U.S. p. 197 n. 2, 60 S.Ct. p. 483 n. 2, 84 L.Ed. p. 699 n. 2), or something else—was left unclear.

*Deitrick v. Greaney* was extended by *D'Oench, Duhme & Co. v. FDIC,* supra. D'Oench, Duhme & Co. ("D'Oench, Duhme") was "engaged in the securities business," *id.,* 315 U.S. p. 454, 62 S.Ct. p. 678, 86 L.Ed. p. 960, and sold some bonds to a bank. The bonds went into default. The bank induced D'Oench, Duhme to make a note to cover the amount of the past due bonds. The bank agreed to hold the note for repayment from any bond interest, and promised not to call the note—but put this promise in a separate writing given to D'Oench, Duhme. A few years later, in 1934, the newly-activated FDIC insured this bank. In 1935, the bank "charged off" the note, but kept the note in its possession. In 1938, FDIC loaned some $1,000,000 to the bank; and took certain assets of the bank, including this note, as collateral. FDIC sued D'Oench, Duhme on the note; D'Oench, Duhme produced the writing in which the bank promised not to call the note. The District Court ruled that the rights of the parties were governed by Illinois law, under which FDIC was a hold-

er in due course *and* D'Oench, Duhme was estopped to deny liability on the note. The Court of Appeals for the Eighth Circuit agreed. D'Oench, Duhme appealed on the ground that Missouri law should apply. The U.S. Supreme Court affirmed the courts below, but modified their rationale. Mr. Justice Douglas for the majority held that the question was one of Federal law, not State law, based on Federal statutes. He pointed out that *Deitrick v. Greaney* was distinguishable, in that D'Oench, Duhme was not a bank director but an outsider dealing with bank officers; there was no proof that D'Oench, Duhme knew anything about bank regulation, or of this bank's condition, or of any actual scheme to mislead anyone; and since the note was executed *before* FDIC was activated, it appeared that no Federal criminal statute was violated. But none of these distinctions made any difference. "One who gives such a note to a bank with a secret agreement that it will not be enforced must be presumed to know that it will conceal the truth from the vigilant eyes of the bank examiners," *id.,* 315 U.S. p. 460, 62 S.Ct. p. 680, 86 L.Ed. p. 963. This "contravenes a general policy to protect the institution of banking from such secret agreements," *id.,* 315 U.S. p. 458, 62 S.Ct. p. 680, 86 L.Ed. p. 962. The policy was indicated by Federal statutes even though those statutes did not cover the precise situation before the Court. "The test is whether the note was designed to deceive the creditors or the public authority or would tend to have that effect," *id.,* 315 U.S. p. 460, 62 S.Ct. p. 681, 86 L.Ed. p. 963. This note must have been so designed, and would certainly tend to have that effect. Therefore, D'Oench, Duhme was liable on the note, notwithstanding the bank's promise not to call the note. Mr. Justice Douglas admitted that this was the judicial creation of civil sanctions supplementing the operation of certain criminal and regulatory laws, *id.,* 315 U.S. p. 461, 62 S.Ct. p. 681, 86 L.Ed. p. 964. Like Mr. Justice Stone in *Deitrick v. Greaney,* he did not make it clear whether this was a variation on the status of holder in due course, an extension of equitable estoppel, a very flexible interpretation of regulatory statutes, or something else.

Justices Frankfurter, Stone and Jackson concurred. They believed that the majority overemphasized Federal statutes, thereby suggesting a sort of quasi-statutory rule of law which was not only new but vague and unnecessary. In their view, FDIC must win and D'Oench, Duhme must lose under Illinois law, Missouri law, "Federal common law," or any other established law, as a holder in due course or by estoppel; and there was no need to say more. (Mr. Chief Justice Stone, who had written the opinion in *Deitrick v. Greaney,* seems to have had second thoughts.)

Whatever it was, the *D'Oench, Duhme* doctrine was extended to the Federal Savings & Loan Insurance Corporation ("FSLIC") in *FSLIC v. Third Nat'l Bank in Nashville,* 173 F.2d 192 (6th Circ.1949). That case involved misrepresentations violating a Federal criminal statute which was a FSLIC counterpart of "a similar section of the Federal Reserve Act" mentioned in *D'Oench, Duhme;* see 173 F.2d pp. 198–199.

Next year, the United States Congress codified *D'Oench, Duhme* in a statute whose present version is 12 U.S.C. § 1823(e). This statute applies of its own force only to banks, and FDIC.

Many courts followed the Sixth Circuit's decision in *FSLIC v. Third Nat'l Bank in Nashville* in applying some version of the *D'Oench, Duhme* doctrine to FSLIC. Some of these decisions relied only on prior case law—i.e. they invoked *D'Oench, Duhme* itself, and extended its rule to FSLIC as a matter of "Federal common law;" see e.g. *FSLIC v. Third Nat'l Bank in Nashville,* supra, *FSLIC v. Lafayette Investment Properties, Inc.,* 855 F.2d 196 (5th Circ.1988), *Taylor Trust v. Security Trust Federal S. & L. Assoc.,* 844 F.2d 337 (6th Circ.1988). Others, while mentioning the *D'Oench, Duhme* case and "Federal common law," also applied 12 U.S.C. § 1823(e) "by analogy," *Firstsouth, F.A. v. Aqua Construction, Inc.,* 858 F.2d 441 (8th Circ.1988). Others did not clearly explain how the FDIC doctrine came to be applied

to FSLIC; see e.g. *Mainland Savings Assoc. v. Riverfront Associates, Ltd.*, 872 F.2d 955 (10th Circ.1989), *FSLIC v. Murray*, 853 F.2d 1251 (5th Circ.1988), *Gulf Federal S. & L. Assoc. v. Mulderig*, 742 F.Supp. 358 (E.D.La.1989). See also *In re Stefanoff*, 106 B.R. 251 (B.C., N.D.Okla. 1989).

FSLIC has now been succeeded by the Resolution Trust Corporation ("RTC"). 12 U.S.C. § 1441a(b)(4) expressly adopts 12 U.S.C. § 1823 for purposes of RTC; see *RTC v. Colorado 126 Partnership*, 746 F.Supp. 35, 37 (D.Colo.1990), *Castleglen, Inc. v. Commonwealth Savings Assoc.*, 728 F.Supp. 656 (D.Utah 1989).

The *D'Oench, Duhme* doctrine has also been applied in favor of an SEC receiver of a corporation making consumer loans and selling securities and "thrift accounts," *Bryan v. Bartlett*, 435 F.2d 28 (8th Circ. 1970 reh. den. 1971); a Chapter X Trustee of a holding company of industrial savings and loan corporations, *In re Diversified Mountaineer Corp.*, 612 F.2d 841 (4th Circ. 1979) aff'g *Duttine v. Savas*, 455 F.Supp. 153 (S.D.W.Va.1978); and a Farm Credit Administration receiver for a Federal land bank, *Grant v. Federal Land Bank of Jackson*, 559 So.2d 148 (La.App., 2d Circ., 1990), and said receiver's assignee, *Federal Land Bank of Jackson v. Shaffett*, 757 F.Supp. 22 (M.D.La.1991).

Estoppel is a time-honored equitable device which prevents a party from taking unfair advantage of his own wrong, 28 AM.JUR.2D (1966) "Estoppel and Waiver" §§ 1–3, 26ff. Traditionally, estoppel is called for only where the wrong is relied upon by another, innocent party to his detriment, *Deitrick v. Greaney*, 309 U.S. p. 197, 60 S.Ct. p. 483, 84 L.Ed. p. 699; 28 AM.JUR.2D, supra, §§ 76–80. "Reliance" and "detriment" in the traditional sense may be difficult to demonstrate in the context of the complicated and impersonal dealings of modern business and society. The *D'Oench, Duhme* doctrine is perhaps best understood as a modern form of estoppel, in which serious violation or subversion of a statutory regulatory scheme takes the place of traditional reliance and detriment

as an indicator that something is genuinely amiss and needs correcting. Its "codification" at 12 U.S.C. § 1823(e) has been interpreted so broadly as to go beyond the bounds of any sort of estoppel or other equitable doctrine, and to empower FDIC to override defenses of wholly innocent parties who have themselves been defrauded, *Langley v. FDIC*, 484 U.S. 86, 108 S.Ct. 396, 98 L.Ed.2d 340 (1987). Although this may be required by a statute applicable directly to FDIC, this Court will not extend so severe a rule into areas not directly governed by that statute. This Court declines to adopt 12 U.S.C. § 1823(e) "by analogy;" but the Court will consider whether the facts of this case justify adoption of the original estoppel-like rule of the cases of *Deitrick v. Greaney* and *D'Oench, Duhme*.

The Trustee and SIPC cite numerous cases expressly comparing FDIC and SIPC; see e.g. *In re Brentwood Securities, Inc.*, 925 F.2d 325, 327 (9th Circ.1991), *In re Stalvey & Associates, Inc.*, 750 F.2d 464, 467 (5th Circ.1985), *SEC v. Albert & Maguire Securities Co., Inc.*, 560 F.2d 569, 571 (3d Circ.1977), *SEC v. Aberdeen Securities Co., Inc.*, 526 F.2d 603, 605 (3d Circ. 1975), *SEC v. Aberdeen Securities Co., Inc.*, 480 F.2d 1121, 1123 (3d Circ.1973), *SEC v. S.J. Salmon & Co., Inc.*, 375 F.Supp. 867, 871 (S.D.N.Y.1974), *In re Bell & Beckwith*, 104 B.R. 842, 851 (B.C., N.D.Ohio W.D.1989), *In re MV Securities, Inc.*, 48 B.R. 156, 160 (B.C., S.D.N.Y.1985). Other cases do not expressly mention FDIC, but describe SIPC in terms reminiscent of FDIC, *SIPC v. Barbour*, 421 U.S. 412, 95 S.Ct. 1733, 44 L.Ed.2d 263 (1975). A few courts, while comparing SIPA with FDIA, point out that these statutes differ in some respects, *In re Bell & Beckwith*, supra, citing *SIPC v. Morgan, Kennedy & Co.*, 533 F.2d 1314, 1318 (2d Circ.1976). Despite differences in detail, SIPA and SIPC are broadly comparable with and similar to FDIA and FDIC.

The activities of SIPC and its Trustees are meant "to further the congressionally-mandated purpose of protecting the investors, who placed their assets with [the bro-

ker], and the SIPC, which insured those investors," in order to "vindicate important public interests," *In re Application of Executive Securities Corp.*, 702 F.2d 406, 410 (2d Circ.1983). Most of the above-cited cases emphasize SIPC's role as liquidator rather than as regulator. But SIPC does act as regulator, either directly or as recipient of reports issued by the National Association of Securities Dealers, Inc. ("NASD"), 15 U.S.C. § 78iii(c), (d). SIPA and SIPC are intended, not merely to provide a mechanism for winding up failed brokers, but to "upgrade the financial responsibility requirements for registered brokers and dealers," *SIPC v. Barbour*, 421 U.S. 412, 415, 95 S.Ct. 1733, 1736, 44 L.Ed.2d 263, 267 so as " 'to eliminate, to the maximum extent possible, the risks which lead to consumer loss,' " *SEC v. Wick*, 360 F.Supp. 312, 314 (N.D.Ill.1973) quoting 3 U.S.Code, Cong. and Admin.News 91st Congress, 2d Session, p. 5254, 5255 (1970). An important part of the regulatory scheme created by SIPA and administered by SIPC and NASD involves maintenance of acceptable net capital ratios by securities dealers, 15 U.S.C. § 78o(c)(3), Rule 15c3–1, 17 C.F.R. § 240.-15c3–1; 15 U.S.C. § 78eee. The fake asset created by Culp and FDR's management, i.e. the note subject to a secret agreement that it would never be collected, was specifically designed to inflate FDR's apparent net capital ratio, making the financial condition of the firm look better than it really was. There is no need to infer or presume such design and intent, for Culp admits it in his answer. The Trustee argues that the deliberate distortion of FDR's net capital ratio by means of this bogus note was a criminal act in violation of 15 U.S.C. § 78jjj(c). This is possible; but it is also possible that said criminal statute applies only to acts directly involved in the process of stockbroker liquidation, and might not apply to acts done some months before a SIPC takeover was imminent (even though such acts were done for the purpose of warding off just such a takeover). This Court need not render an advisory opinion on the exact interpretation of this criminal statute; for, at the very least, the creation of this fake asset certainly subverted the general purpose and frustrated the basic policy of SIPA. This conspiracy to misrepresent FDR's net capital ratio was not merely a harmless transgression of some arcane technical regulation; for, as Culp himself admits, "FDR eventually failed to maintain a proper 'Net Capital Ratio,' and ... this failure was a primary cause of the S.E.C. closing FDR." The "failure" came sooner than was apparent, thanks to bogus assets such as this note.

The law should indeed be "based on ... fairness." And "the fairness" of Culp's "position" is indeed "plain to see." Since Culp made an open and formal promise to pay $560,181.01 which he expected NASD regulators (and SIPC and FDR's customers and creditors and the general public) to believe, it is only fair that Culp be held to his promise. He will not be heard to complain that he is being taken at his word. The fact that there was little or no consideration for his note, because the note was not really evidence of a legitimate business transaction, is part of the essence of this fraud; and aggravates rather than mitigates Culp's dereliction herein. Since the FDR management's secret promise to Culp not to collect on his note was illegitimate and fraudulent, if not actually criminal, and its fraudulent purpose was known to Culp at the time, it is only fair that such promise be disregarded and treated as unenforceable. Since Culp was himself partly responsible for FDR's net capital deficit, and deliberately helped FDR carry on its business longer than it had any right to, regardless of consequences to customers and creditors, it is only fair that Culp be required to make up some of the losses inflicted by FDR's final collapse.

Because it is not clear whether a criminal act has been committed, the facts of this case are not quite as compelling as are those of *Deitrick v. Greaney*. But because of Culp's admitted knowing participation in a scheme to mislead regulators, the facts of this case are even more compelling than those of *D'Oench, Duhme* itself. There is no reason why the example of *D'Oench, Duhme* should *not* be followed in this case.

Ordinarily, estoppel and similar matters offer a poor field for summary judgment, since they depend on particular facts and circumstances whose existence, relevance and weight may be disputed or unclear. In this case, however, facts are provided out of the respondent's own mouth, which are sufficient to justify application of the rule of *D'Oench, Duhme*. There can be no genuine issue on this point.

The Court concludes that the note should be enforced according to its apparent terms, and that Culp is not permitted to raise lack of consideration or any alleged secret agreement not to collect the note as defenses to suit on the note. Culp's claim in the name of ICI against FDR can be set off against Culp's liability to FDR on the note, thereby extinguishing the claim against FDR's estate, but also reducing the amount due to FDR's Trustee on the note.

The Trustee also seeks judgment for interest "from and to April 20, 1989, at the maximum legal rate ...;" "reasonable attorneys' fees," citing 12 O.S. § 936; and costs. It is not clear whether the Trustee seeks interest under the contract at the contract rate, or under some other principle at some other rate; whether or to what extent 12 O.S. § 936, a statute of the State of Oklahoma, should apply to this action in a Federal court; what "reasonable" attorney fees amount to so far in this matter; and whether, or to what extent and in what amount, costs may be awarded in this action. Therefore, the Court will not grant summary judgment as to those matters, but will reserve them for trial.

Accordingly, the Trustee's "... Motion for Summary Judgment" is granted in part and denied in part, as follows: Culp's claim in the name of ICI against the estate of FDR is extinguished by setoff and is therefore disallowed; the Trustee is granted judgment against Culp on the note in the face amount of the note less the amount of Culp's claim, i.e. in the net amount of $555,-181.01; and trial on the remaining issues of liability for and/or amounts of interest, attorney fees, and costs, will be held as

previously scheduled on *August 12, 1991, at 9:15 o'clock a.m.*

AND IT IS SO ORDERED.